2007-NMCA-057

159 P.3d 266

**Christopher R. MOYA, Worker–Appellant,**

v.

**CITY OF ALBUQUERQUE,
Employer–Appellee.**

No. 26,382.

Court of Appeals of New Mexico.

March 16, 2007.

Certiorari Granted, No. 30,343,
May 11, 2007.

**618**

Gerald A. Hanrahan, Albuquerque, NM, for Appellant.

Butt Thornton & Baehr PC, Carlos G. Martinez, Emily A. Franke, Albuquerque, NM, for Appellee.

## OPINION

CASTILLO, Judge.

{1} This workers' compensation appeal provides us with another opportunity to address an employer's right to an offset when the injured employee gets a job with a new employer. The Workers' Compensation Judge (WCJ) concluded that under NMSA 1978, § 52–1–47.1(A) (1990), the City of Albuquerque (Employer) was entitled to an offset. We reverse. We conclude that under the law in existence at the time Worker was injured, Employer was not entitled to an offset for wages provided by another employer. We also address the WCJ's finding that Worker's job as a correctional officer was "medium" work, rather than "heavy" work. We conclude that substantial evidence supports the WCJ's finding, and we affirm this determination.

## I. BACKGROUND

{2} Worker was employed as a correctional officer at the Bernalillo County Metropolitan Detention Center. He was injured on February 25, 2004. Worker testified that three inmates, who he understood had started a riot at another correctional facility, were being transferred to the detention center. With full knowledge by supervisors, a "welcoming party" had been planned to let the troublesome inmates know that such behavior would not be tolerated. Worker testified that the first inmate was brutally beaten by as many as fifteen or twenty correctional officers. Worker said he objected but was told by a superior officer to "shut the hell up." While Worker was escorting a beaten inmate out of the area, Worker was injured when he was struck by a fellow officer in the neck and shoulder region. Worker's claim was that he was accidentally struck when the officer was trying to strike the inmate whom Worker was escorting.

{3} Following the incident, there was an internal affairs investigation. Worker said he was pressured by superior officers to alter his testimony about the beatings, but he said he testified truthfully about the beatings in the internal affairs investigation. Employer fired him on March 12, 2004. The WCJ found that Worker's termination was "without good cause." Worker was unemployed until January 1, 2005, when he obtained employment with Cornell Corrections. The WCJ allowed Employer an offset for wages Worker received from his subsequent employer, and Worker appeals that decision.

{4} In this opinion, we distinguish between an employer that employs a worker at the time of an injury (at-injury employer) and an employer that employs a worker after the injury (subsequent employer). Employer here is an at-injury employer.

## II. STANDARD OF REVIEW

{5} We review factual findings under a whole record standard of review. *See Tom Growney Equip. Co. v. Jouett*, 2005–NMSC–015, ¶ 13, 137 N.M. 497, 113 P.3d 320. "Under that standard, we must consider all evidence bearing on the findings, favorable or unfavorable, to determine if there is substantial evidence to support the result." *Id.* (internal quotation marks and citation omitted). However, the interpretation of Section 52–1–47.1 is a legal issue, which we review de novo. *See Grubelnik v. Four–Four, Inc.*, 2001–NMCA–056, ¶ 9, 130 N.M. 633, 29 P.3d 533.

## III. DISCUSSION

### A. Employer's Right to an Offset Under Section 52–1–47.1

{6} We previously addressed an employer's right to an offset in *Grubelnik*, a case decided under NMSA 1978, § 52–1–25.1 (1990). *See Grubelnik*, 2001–NMCA–056,

¶¶ 16–24, 130 N.M. 633, 29 P.3d 533. In *Grubelnik*, we held that an employer that did not make an offer of employment to an injured worker was not entitled to an offset when the worker got another job. *See id.* Here, Employer persuaded the WCJ that another workers' compensation statute, Section 52–1–47.1, entitled Employer to an offset.

{7} Section 52–1–47.1(A) provides the following:

Unless otherwise contracted for by the worker and employer, workers' compensation benefits shall be limited so that no worker receives more in total payments, including wages and benefits from his employer, by not working than by continuing to work. Compensation benefits under the Workers' Compensation Act [Chapter 52, Article 1 NMSA 1978] shall accordingly be reduced, if necessary, to account for any wages and employer-financed disability benefits a worker receives after the time of injury. For the purposes of this section, total payments shall be determined on an after-tax basis. This section does not apply to social security payments, employee-financed disability benefits, benefits or payments a worker received from a prior employer, payments for medical or related expenses or general retirement payments, except it does apply to disability retirement benefits.

{8} Employer persuaded the WCJ that the statute meant that a worker could not be better off financially by working than he was before he was injured. Employer added the worker's compensation benefits it was providing to the wages Worker was receiving at his new job, concluded that he was better off, and asserted that a reduction in benefits was warranted. Under this interpretation of the statute, the term "employer" is not limited to an at-injury employer but includes a subsequent employer. An employer receives credit not only for any wages and benefits it finances or provides but also for any wages paid by anyone else.

{9} Our task is to determine legislative intent. *See Gurule v. Dicaperl Minerals Corp.*, 2006–NMCA–054, ¶ 7, 139 N.M. 521, 134 P.3d 808. Legislative history provides a valuable clue about the meaning and purpose of Section 52–1–47.1. Worker argues, and Employer does not dispute, that Section 52–1–47.1 was enacted as a legislative response to *Montney v. State ex rel. State Highway Dep't*, 108 N.M. 326, 329–30, 772 P.2d 360, 363–64 (Ct.App.1989). *Montney*, decided in 1989, held that an employer was not entitled to an offset for Public Employees Retirement Act (PERA) disability benefits because nothing in the Workers' Compensation Act (Act) provided for such offset. *See id.* In the following year, 1990, the legislature enacted Section 52–1–47.1, which supports Worker's argument that the section was enacted in response to *Montney*. Consequently, it appears the statute's purpose was to give employers that have financed disability benefits credit for the benefits they have provided or financed.

{10} In addition to considering the statute's purpose, we consider the plain language of the statute to determine legislative intent. *See Gurule*, 2006–NMCA–054, ¶ 7, 139 N.M. 521, 134 P.3d 808. The plain language of the statute is consistent with the statute's purpose. The first sentence of the statute states that benefits should be limited so that "no worker receives more in total payments, including wages and benefits from his employer, by not working than by continuing to work." Section 52–1–47.1(A). This language obviously addresses the problem in *Montney*, where the worker received more by not working than by working because he received PERA disability benefits in addition to workers' compensation benefits.

{11} The following sentence in the statute is consistent with the first sentence. It gives employers who provide "wages and employer-financed disability benefits" an offset. Section 52–1–47.1(A). If the term "employer" is interpreted to mean the at-injury employer, the employer that provides benefits to the employee gets credit for those benefits. If the employer did not get credit for the extra benefits the employer provided, then an employee would receive a windfall, as did the worker in *Montney*. *See* 108 N.M. at 330, 772 P.2d at 364. The worker would have no incentive to return to work, since he or she would be better off not working. It is

understandable that the legislature would act to prohibit that result. *See Gurule,* 2006–NMCA–054, ¶ 7, 139 N.M. 521, 134 P.3d 808 (stating that the Act encourages workers to return to work with minimal reliance on compensation awards).

{12} The remainder of Section 52–1–47.1 is also consistent with a conclusion that an at-injury employer gets credit only for wages and benefits it provides or finances. The section lists exclusions, for which the employer is not entitled to a reduction. The listed exclusions are "social security payments, employee-financed disability benefits, benefits or payments a worker received from a prior employer, payments for medical or related expenses or general retirement payments." Section 52–1–47.1(A). All of these refer to payments from sources other than the at-injury employer: payments from the government, payments from plans employees have obtained themselves, or payments from prior employers. The statute's exclusion of payments from independent sources, i.e., sources other than the at-injury employer, is consistent with the idea that an employer gets credit only for wages and benefits provided by the at-injury employer.

{13} We strive to harmonize the statutory language to achieve the overall legislative purpose. *See Eldridge v. Circle K Corp.,* 1997–NMCA–022, ¶ 29, 123 N.M. 145, 934 P.2d 1074. An interpretation giving an employer credit only for wages and benefits it alone has provided is in harmony with all of the language of the statute and makes the statute internally consistent. Such an interpretation is consistent with the change the legislature sought to make after *Montney.* This interpretation is also consistent with the legislature's expressed intent that an employer that provides wages and benefits receives an offset for those benefits so that a worker will not receive "more in total payments, including wages and benefits from his employer, by not working than by continuing to work." Section 52–1–47.1(A).

{14} Employer raises a number of arguments in support of its interpretation of Section 52–1–47.1. Employer argues that if it does not get an offset, Worker will receive more benefits by not working than by continuing to work. That is inaccurate. Worker would receive more because he is working. Thus, a fundamental premise underlying the application of the statute is lacking.

{15} Employer relies on an expansive view of the terms "employer" and "wages" and argues that they mean any employer and any wages. But there is no language in Section 52–1–47.1 specifically stating that an employer is entitled to an offset for wages paid by a subsequent employer. We presume the legislature knew how to address that eventuality, but the statute is silent on that point. We decline to read in language that is not there, particularly when the statute consistently uses language reflecting the statute's purpose to allow employers that provide benefits credit only for those benefits. *See Cobb v. State Canvassing Bd.,* 2006–NMSC–034, ¶ 34, 140 N.M. 77, 140 P.3d 498 (stating that we will not read language into a statute if the statute makes sense as written).

{16} Employer argues that the statute "reflects a []legislative intent that a worker not receive more compensation by virtue of being under the Act's disability system than the worker would have received had he not been injured and continued to work." This poses a false test and does not accurately state the actual language used by the legislature. Employer's comparison is between the current compensation from all sources and what the employee would be getting if nothing had happened and the worker had never been injured. The statute does not say that. In our view, the correct comparison is between the workers' compensation received under the Act and the total amount reflecting the workers' compensation, plus any additional wages and/or benefits provided by the at-injury employer.

{17} Employer contends that its construction is consistent with the Act's policies of protecting injured workers from becoming dependent on public welfare and of encouraging them to return to work as soon as possible. This argument rings hollow. The problem here is not that Worker was malingering and becoming dependent on welfare. Worker got a new job after Employer fired him. The policies that Employer says are being advanced by reducing Worker's benefits are

not being advanced at all. If anything, Employer's construction provides no incentive for employers to support their injured workers. *Cf. Gurule*, 2006–NMCA–054, ¶ 7, 139 N.M. 521, 134 P.3d 808 (stating that one goal of the Act is to promote rehiring of injured workers). Under Employer's interpretation, employers may decline to make offers to rehire or may even fire injured workers—with the hope that the employees will get other jobs and thereby lighten the at-injury employers' burden of paying workers' compensation. We cannot see how interpreting Section 52–1–47.1 in this fashion advances any policy expressed by the Act.

{18} For all of these reasons, we hold that Section 52–1–47.1 provides an offset only for wages and employer-financed benefits that the at-injury employer provides. The statute does not allow an offset for wages paid by a subsequent employer. Consequently, we reverse the compensation order on this point and remand for recalculation of benefits.

## B. Section 52–1–25.1

■ {19} As we have discussed, our decision in *Grubelnik* prohibits an employer that does not make an offer of employment from receiving an offset. *Grubelnik* dealt with Section 52–1–25.1 and was decided in 2001. The legislature may have disagreed with our decision in *Grubelnik;* Section 52–1–25.1 was changed in 2005. *See* NMSA 1978, § 52–1–25.1(B) (2005). The new version absolves an employer from paying temporary total disability benefits if the worker accepts employment with another employer at the worker's pre-injury wage. *See id.*

{20} In our case, Employer argues that even if we disagree with its interpretation of Section 52–1–47.1, the WCJ's decision to award Employer an offset should be affirmed because it is right for any reason. Employer contends that under the new version of Section 52–1–25.1, Employer would be entitled to a reduction in the amount of temporary total disability benefits. We disagree because the law in effect at the time of injury applies. *See Strickland v. Coca–Cola Bottling Co.*, 107 N.M. 500, 502, 760 P.2d 793, 795 (Ct.App.1988) (stating that the provisions of the Act in force at the time the cause of

action accrues govern). Worker was injured in 2004. Consequently, Employer cannot rely on a 2005 enactment. Employer argues, however, that the new version should be given retroactive effect because it is a clarification of law. We need not decide this issue. Even if the new statute were to apply, Employer would not receive a reduction unless Worker's new employment paid at least his pre-injury wage. Worker's new job did not pay as much as his job with Employer. Consequently, even if we were to apply the new statute, Employer still would not prevail because it has not established that the new version of the statute would apply to these facts.

{21} For these reasons, we hold that the legislature's change to Section 52–1–25.1 in 2005 does not affect this case. Future cases will be governed by the new version of Section 52–1–25.1. Our holding is limited. We hold only that Employer was not entitled to an offset under Section 52–1–47.1.

## C. Physical Capacity

■ {22} In determining Worker's disability, the WCJ must consider the difference between Worker's physical capacity to perform his usual and customary work and Worker's residual physical capacity after the injury. *See* NMSA 1978, § 52–1–26.4 (2003); *Rodriguez v. La Mesilla Constr. Co.*, 1997–NMCA–062, ¶ 28, 123 N.M. 489, 943 P.2d 136. Points are calculated based on the classification of the pre-injury work. The WCJ characterized Worker's usual and customary work before the injury as requiring "medium" exertion. Worker contends it should have been classified as "heavy." The determination of a worker's usual and customary work is an issue of fact for the WCJ, and we review the determination to see whether it is supported by substantial evidence. *See Medina v. Berg Constr., Inc.*, 1996–NMCA–087, ¶ 17, 122 N.M. 350, 924 P.2d 1362.

{23} Section 52–1–26.4(C) defines "heavy" as the "ability to lift over fifty pounds occasionally or up to fifty pounds frequently." The statute defines "medium" as the "ability to lift up to fifty pounds occasionally or up to twenty-five pounds frequently." *Id.* Worker claims his job was "heavy" and relied on an

exhibit containing a written description of the duties of a correctional officer. The job description, under the section titled "ESSENTIAL DUTIES," states that an officer may have to lift a human body, to control inmates by force, to defend oneself and others against physical attack by inmates, to use force or deadly force, and to carry an injured or unconscious person various distances to safety, including up or down stairs and ladders.

{24} However, the exhibit containing the job description also contained a section titled "LIFTING," which contained a breakdown of the lifting that would be required. This section stated that lifting one to ten pounds occurred with a frequency of 67%, that lifting eleven to twenty pounds occurred with a frequency of 34% to 66%, and that lifting more than thirty-five pounds occurred with a frequency of 1% to 10%. Based on these percentages, the exhibit characterized lifting up to ten pounds as "[c]ontinuously," from eleven to twenty pounds as "[f]requently," and more than thirty-five pounds as "[r]arely." These percentages establish that a correctional officer was required to lift up to thirty-five pounds frequently and more than thirty-five pounds rarely. The lifting requirements detailed by the exhibit establish that the vast majority of the lifting involved weight less than thirty-five pounds and that lifting more than thirty-five pounds was involved rarely, 10% of the time or less. Section 52–1–26.4(C) defines "medium" as the "ability to lift up to fifty pounds occasionally or up to twenty-five pounds frequently." We conclude that the WCJ's finding that the job as a correctional officer required "medium" physical capacity is consistent with the section of the job description containing lifting requirements and is supported by the evidence. The WCJ was not required to weigh the job description in the section titled "ESSENTIAL DUTIES" more heavily than the job description in the section dealing with lifting.

{25} We also conclude that the job description on which Worker relies does not establish what was usual and customary. We agree that at times, being a correctional officer is strenuous and dangerous. However, we believe the focus under Section 52–1–26.4 is on what is usual or customary, not on what might happen or what happens in relatively rare circumstances. The term "usual" refers to the "ordinary course of events." *Merriam–Webster's Collegiate Dictionary* 1378 (11th ed.2005). One definition of the term "customary" is "commonly practiced, used, or observed." *Id.* at 308. These terms denote the ordinary and the normal. The section of the job description on which Worker relies appears to address what a correctional officer might be required to do on occasion. It does not establish that the described scenarios occurred frequently or that they were usual and customary.

{26} It was the WCJ's task to determine the level of physical capacity that was necessary in the usual and customary course of the job. *See Medina,* 1996–NMCA–087, ¶ 17, 122 N.M. 350, 924 P.2d 1362. The WCJ could conclude that the specific section of the job description containing lifting requirements was consistent with "medium" work, as defined by Section 52–1–26.4(C). The WCJ could also conclude that Worker's description of what might be required, in what appears to be limited circumstances, did not reflect what was usual and customary. We affirm the WCJ's finding that Worker's job as a correctional officer was classified as "medium" work.

**D.  Attorney Fees on Appeal**

{27} We conclude that Worker's attorney is entitled to attorney fees related to this appeal. Assuming that any award would not raise the total fees awarded in this case above the $16,500 cap set by NMSA 1978, § 52–1–54(I) (2003), we remand this case to the WCJ to determine an appropriate award.

**IV.  CONCLUSION**

{28} The award of an offset is reversed. The WCJ's findings concerning physical capacity are affirmed.

{29} **IT IS SO ORDERED.**

WE CONCUR: A. JOSEPH ALARID and IRA ROBINSON, Judges.