The slip opinion is the first version of an opinion released by the Chief Clerk of the Supreme Court. Once an opinion is selected for publication by the Court, it is assigned a vendor-neutral citation by the Chief Clerk for compliance with Rule 23-112 NMRA, authenticated and formally published. The slip opinion may contain deviations from the formal authenticated opinion.

**IN THE COURT OF APPEALS OF THE STATE OF NEW MEXICO**

**Opinion Number: _____**

**Filing Date: APRIL 6, 2021**

**No. A-1-CA-37503**

**BRYAN K. TAYLOR,**

      Worker-Appellant,

**v.**

**WASTE MANAGEMENT OF NEW MEXICO, INC. and GALLAGHER BASSETT SERVICES, INC.,**

      Employer/Insurer-Appellees.

**APPEAL FROM THE WORKERS' COMPENSATION ADMINISTRATION**
**Anthony "Tony" Couture, Workers' Compensation Judge**

Gerald A. Hanrahan
Albuquerque, NM

for Appellant

Evie M. Jilek
Albuquerque, NM

for Appellees

**OPINION**

**ATTREP, Judge.**

{1}      Bryan Taylor (Worker) appeals from a compensation order entered pursuant to the Workers' Compensation Act (the Act), NMSA 1978, §§ 52-1-1 to -70 (1929, as amended through 2017), limiting Worker's temporary total disability benefits (TTD benefits). After Waste Management of New Mexico, Inc. (Employer) terminated Worker, Worker earned wages from other employers below his preinjury wage. The Workers' Compensation Judge (WCJ) determined, under these circumstances, that Worker was not entitled to full TTD benefits. Because the WCJ's decision is contrary to the law that existed when Worker was injured,[1] we reverse.

**BACKGROUND**

**I.      Statutory Background**

---

[1] The Legislature enacted Section 52-1-25.1, the statute governing TTD benefits, in 1990, amended it in 2005, and amended it again in 2017. We are called on in this opinion to construe the 2005 version of Section 52-1-25.1, the version in effect at the time of Worker's injury. *See* § 52-1-48 ("The benefits that the worker shall receive during the entire period of disability and the benefits for death shall be based on and limited to the benefits in effect on the date of the accidental injury resulting in the disability or death."); *Jojola v. Aetna Life & Cas.*, 1989-NMCA-085, ¶ 6, 109 N.M. 142, 782 P.2d 395 ("[I]n workers' compensation cases the uniform rule in this state has been that a claim for benefits is governed by the law in effect at the time the cause of action accrued."). As a result, we express no opinion about the meaning of the 2017 version of Section 52-1-25.1, or whether Worker would be entitled to TTD benefits under that provision. All references to Section 52-1-25.1 in this opinion are to the 2005 version, unless otherwise indicated.

{2} "Temporary total disability," as used in the Act, "means the inability of a worker, by reason of accidental injury arising out of and in the course of the worker's employment, to perform the duties of that employment prior to the date of the worker's maximum medical improvement [(MMI)]." Section 52-1-25.1(A). Generally speaking, workers suffering from a temporary total disability are entitled to TTD benefits in the amount of two-thirds their average weekly wage (AWW).[2] *See* § 52-1-41(A) (1999). Absent one of two exceptions, "the statute requires payment of full total disability benefits." *Ortiz v. BTU Block & Concrete Co.*, 1996-NMCA-097, ¶ 10, 122 N.M. 381, 925 P.2d 1 (construing the 1990 version of Section 52-1-25.1); *see also Hawkins v. McDonald's*, 2014-NMCA-048, ¶ 9, 323 P.3d 932 ("Section 52-1-25.1 of the [Act] limits the payment of TTD benefits to an injured worker prior to the date of MMI in only two circumstances.").

{3} The two exceptions to a worker's entitlement to full TTD benefits are set out in Section 52-1-25.1. Subsection B defines the first exception:

> If, prior to the date of [MMI], an injured worker's health care provider releases the worker to return to work, the worker is not entitled to [TTD] benefits if:
>
> (1) *the employer offers work* at the worker's preinjury wage; or
>
> (2) the worker *accepts employment with another employer* at the worker's preinjury wage.

---

[2] We refer, throughout this opinion, to preinjury wage and AWW interchangeably.

2

Section 52-1-25.1(B) (emphases added). Subsection C defines the second exception:

> If, prior to the date of [MMI], an injured worker's health care provider releases the worker to return to work and *the employer offers work* at less than the worker's pre-injury wage, the worker is disabled and shall receive [TTD] compensation benefits equal to two-thirds of the difference between the worker's pre-injury wage and the worker's post-injury wage.

Section 52-1-25.1(C) (emphasis added). At issue in this appeal is the offset provision in Section 52-1-25.1(C).

## II.     Factual and Procedural Background

{4}     The following facts are uncontested. Worker suffered numerous injuries in January 2013 while being trained as a residential garbage collector for Employer. Not long after being hired, Worker was on duty when a garbage container fell through the gripper of the garbage truck and landed inside the truck's hopper. Worker's trainer directed him to climb up the gripper arm, reach into the hopper, and pull the container out. While doing so, Worker lost his balance and fell backward onto the side of the truck and then to the pavement about thirteen feet below. Worker's injuries included a traumatic brain injury, spinal injuries, and a lacerated spleen and kidney. Worker's AWW with Employer was $829.50 and, as a result, his compensation rate for TTD benefits is $553.00 (two-thirds of AWW). *See* § 52-1-41(A) (1999).

**{5}** Worker returned to work in April 2013 and remained employed with Employer until he was terminated in July 2013. After his termination, Worker obtained employment with other companies, although, for the most part, he earned less than AWW. Employer issued partial TTD benefits, taking credit for wages Worker earned from his subsequent employers and claiming that the offset provision in Section 52-1-25.1(C) applied to those earnings. Since December 2017 Employer has been paying full TTD benefits because Worker has been unable to work. At issue below and now on appeal is the appropriate amount of TTD benefits for the period between Worker's termination and December 2017, in which Worker was earning less than AWW from other employers.

**{6}** Worker filed a complaint with the Workers' Compensation Administration, asserting that Employer had no authority to reduce Worker's benefits if his earnings from *other employers* did not exceed AWW. After a trial, the WCJ entered a compensation order making numerous findings, including that Worker had not reached MMI, Employer's proffered reason for terminating Worker was not credible, Worker had endeavored to remain gainfully employed since being injured, and Worker had not otherwise abandoned his job with Employer. The WCJ, however, disagreed with Worker's position that he was entitled to full TTD benefits during the period in question. Although the WCJ understood that the plain language of Section 52-1-25.1 supported Worker's position, the WCJ thought an award of full

4

TTD benefits would be unfair to Employer and "contrary to the spirit and purpose" of the Act. The WCJ thus capped Worker's TTD benefits, determining that "the total amount . . . Worker receives from his employment and his [TTD benefits] shall not exceed . . . Worker's [AWW] of $829.50." In reducing Worker's TTD benefits, the WCJ did not rely on Section 52-1-25.1(C), but rather on two other provisions of the Act and a case interpreting one of those provisions. Worker appeals.

**DISCUSSION**

{7} This appeal raises the following question: After Employer terminated Worker, was Employer permitted to reduce the TTD benefits it paid to Worker based on Worker's earnings from other employers that were less than AWW? Resolving this question requires us to interpret Section 52-1-25.1 and other provisions of the Act; our review, accordingly, is de novo. *See Baca v. Los Lunas Cmty. Programs*, 2011-NMCA-008, ¶ 11, 149 N.M. 198, 246 P.3d 1070 ("We review the WCJ's legal conclusions regarding statutory construction de novo.").

{8} Our "guiding principle when construing statutes is to determine and give effect to legislative intent."[3] *Fowler v. Vista Care*, 2014-NMSC-019, ¶ 7, 329 P.3d

---

[3]Worker contends that we should liberally construe the Act in his favor. *See, e.g.*, *Dupper v. Liberty Mut. Ins. Co.*, 1987-NMSC-007, ¶ 5, 105 N.M. 503, 734 P.2d 743 ("We are committed to the view that, as remedial legislation, the . . . Act must be liberally construed, with all doubts resolved in favor of the worker."). In 1990, however, the Legislature "declare[d] that the [Act is] not remedial in any sense and [is] not to be given a broad liberal construction in favor of the claimant or employee on the one hand, nor are the rights and interests of the employer to be favored over

5

630 (internal quotation marks and citation omitted). "To discern the Legislature's intent, we rely on the classic canons of statutory interpretation and look first to the plain language of the statute, giving the words their ordinary meaning, unless the Legislature indicates a different one was intended." *Id.* (internal quotation marks and citation omitted). "Statutory language that is clear and unambiguous must be given effect" unless the result would be "absurd, unreasonable, or contrary to the spirit of the statute." *Id.* (internal quotation marks and citations omitted). In other words, while the existence of a plain meaning might normally end our inquiry, it may nevertheless be necessary to examine, inter alia, the history, background, and overall structure of the statutory provision being construed, as well as the purpose of the statute. *See id.* ¶¶ 7, 13; *see also Dewitt v. Rent-A-Center, Inc.*, 2009-NMSC-032, ¶ 29, 146 N.M. 453, 212 P.3d 341 (observing that where the plain language of the

---

those of the employee on the other hand." NMSA 1978, § 52-5-1 (1990). We observe that, since the enactment of this provision, our Supreme Court has given conflicting signals on whether courts may continue to liberally construe the Act in favor of workers. *Compare, e.g.*, *Benavides v. E. N.M. Med. Ctr.*, 2014-NMSC-037, ¶ 44, 338 P.3d 1265 (holding that, notwithstanding Section 52-5-1, the Legislature "did not intend [for] the courts to disregard precedent . . . applying liberal construction" and "that liberal construction can still be applied . . . as it is but one of many tools employed in construing legislation"), *with Rodriguez v. Brand W. Dairy*, 2016-NMSC-029, ¶ 12, 378 P.3d 13 (stating, without acknowledging *Benavides*, that Section 52-5-1 "*requires* [courts] to balance equally the interests of the worker and the employer without showing bias or favoritism toward either" (emphasis added) (internal quotation marks and citation omitted)). We do not attempt to synthesize or resolve these seemingly inconsistent approaches advanced by our Supreme Court, however, because, following the Legislature's direction not to construe the Act in favor of either party, we rule for Worker.

Act is clear, our statutory construction inquiry should normally end, but considering other principles of statutory construction to the extent the language could be considered ambiguous); *Massengill v. Fisher Sand & Gravel Co.*, 2013-NMCA-103, ¶¶ 7-12, 311 P.3d 1231 (examining the employer's contentions against applying the plain meaning of the statute). Thus, we "exercise caution in relying only on the plain language of a statute because its beguiling simplicity may mask a host of reasons why a statute, apparently clear and unambiguous on its face, may for one reason or another give rise to legitimate (i.e., nonfrivolous) differences of opinion concerning the statute's meaning." *Fowler*, 2014-NMSC-019, ¶ 13 (alteration, internal quotation marks, and citation omitted); *see also Benny v. Moberg Welding*, 2007-NMCA-124, ¶ 5, 142 N.M. 501, 167 P.3d 949 (observing that while "[w]e start with the language itself, giving effect to its plain meaning where appropriate," we must be "careful not to be misled by simplicity of language when the other portions of a statute call its meaning into question, or the language of a section of an act conflicts with an overall legislative purpose" (internal quotation marks and citation omitted)).

{9}    The parties in this case present divergent views about the plain meaning of the relevant statutory language, legislative history, and legislative goals and purposes. The WCJ in contrast largely justified his decision based on principles of fairness. We focus our analysis accordingly. Based on our review of the statutory language, legislative history, and the goals and purposes of the Act, these sources all support

7

the conclusion that Worker is entitled under Section 52-1-25.1 to full TTD benefits during the weeks he earned less than AWW from other employers. Further, the WCJ's justifications for departing from the plain meaning of Section 52-1-25.1 are without merit and, accordingly, do not alter our conclusion.

**I.     The Plain Language of Section 52-1-25.1**

{10}    We begin with the language of Section 52-1-25.1, *see Fowler*, 2014-NMSC-019, ¶ 7, and conclude that its plain meaning does not permit Employer to reduce Worker's TTD benefits during the weeks he earned less than AWW from other employers. Critical to our analysis are the words the Legislature chose to use in the two subsections of Section 52-1-25.1 that eliminate or reduce the payment of full TTD benefits under certain circumstances.

{11}    First, Subsection B provides that an injured worker who has not reached MMI but is released to return to work is not entitled to TTD benefits if:

> (1)     *the employer offers work* at the worker's preinjury wage; or
>
> (2)     the worker *accepts employment with another employer* at the worker's preinjury wage.

Section 52-1-25.1(B) (emphases added). As Employer acknowledges, Subsection B explicitly draws a distinction between "the employer" and "another employer," with the former referring to the entity employing the worker at the time of injury (the at-injury employer), and the latter referring to any other entity employing the worker

8

post-injury. *See Moya v. City of Albuquerque*, 2007-NMCA-057, ¶ 19, 141 N.M. 617, 159 P.3d 266 (recognizing that Section 52-1-25.1(B) "absolves an employer from paying [TTD] benefits if the worker accepts employment with another employer at the worker's pre-injury wage"), *rev'd on other grounds*, 2008-NMSC-004, 143 N.M. 258, 175 P.3d 926. Under Subsection (B)(1), the worker is not entitled to TTD benefits if the at-injury employer offers work at or above the worker's preinjury wage—even if the worker declines the offer. *See Jeffrey v. Hays Plumbing & Heating*, 1994-NMCA-071, ¶ 6, 118 N.M. 60, 878 P.2d 1009 (explaining that, under the 1990 version of the statute, "Section 52-1-25.1 applies so long as the worker is offered the position, even if the worker does not accept and become rehired"). Under Subsection (B)(2), even if the at-injury employer does not offer work at or above the worker's preinjury wage, the worker still is not entitled to TTD benefits if he or she obtains employment with another employer at or above the preinjury wage. Even though Worker is not seeking TTD benefits for the weeks in which he earned his preinjury wage from other employers, the distinction that the Legislature drew between at-injury employers and other employers in Subsection B guides our examination of Subsection C, the provision at issue in this case.

{12}    Subsection C permits employers to reduce TTD benefits, where the injured worker has not reached MMI but is released to return to work, if:

> *the employer offers work* at less than the worker's pre-injury wage, [in which case the worker] shall receive [TTD] compensation benefits

9

> equal to two-thirds of the difference between the worker's pre-injury
> wage and the worker's post-injury wage.

Section 52-1-25.1(C) (emphasis added). Like Subsection (B)(1), Subsection C applies only when "the employer offers work." Because the phrase "the employer offers work" in Subsection (B)(1) refers to the "at-injury employer" alone, we decline to ascribe to it a different meaning in Subsection C. *See State v. Jade G.*, 2007-NMSC-010, ¶ 28, 141 N.M. 284, 154 P.3d 659 ("[I]t is considered a normal rule of statutory construction to interpret identical words used in different parts of the same act as having the same meaning." (alteration, internal quotation marks, and citation omitted)); *Couch v. Williams*, 2016-NMCA-014, ¶ 19, 365 P.3d 45 (same). Thus, under the plain language of Section 52-1-25.1, Subsection C applies only when the at-injury employer offers work at less than the worker's preinjury wage; unlike Subsection (B)(2), Subsection C does not apply if the at-injury employer makes no such offer of work but the worker "accepts employment with another employer." *Compare* § 52-1-25.1(C), *with* § 52-1-25.1(B)(2).

{13}    Contrary to the WCJ, who recognized that the plain meaning of Section 52-1-25.1 required Employer to pay Worker full TTD benefits, Employer maintains that the language of Subsection C permits a reduction of Worker's TTD benefits under the circumstances of this case. Although Employer acknowledges that the Legislature drew a clear distinction between the at-injury employer and subsequent employers in Subsection B, Employer asserts, without support in legal authority or

10

argument, that the word "employer" in Subsection C encompasses both the at-injury employer and subsequent employers. Employer's assertion is contrary to the basic principle of statutory construction applied above—that identical words within an act are to be given the same meaning. *See, e.g.*, *Jade G.*, 2007-NMSC-010, ¶ 28. Nor can Employer's contention be reconciled with the general principle that "when the Legislature includes a particular word in one portion of a statute and omits it from another portion of that statute, such omission is presumed to be intentional." *Id.*

{14}    Furthermore, an absurdity would result were we to accept Employer's contention that "the employer" in Subsection C also means "another employer." Construing "the employer" in this manner would permit the at-injury employer to receive the offset in Subsection C so long as the at-injury employer *or* another employer merely offers work at less than the worker's preinjury wage. *See* § 52-1-25.1(C). In other words, Employer's construction would permit an at-injury employer not offering work to reduce the worker's TTD benefits so long as another employer offered work at less than the worker's preinjury wage, even if the worker declined that offer. This would be in stark contrast to Subsection B, where an at-injury employer not offering work still has to pay full TTD benefits even if another employer offers work at or above the worker's preinjury wage, but the worker declines that offer. *See* § 52-1-25.1(B). We can think of no principled reason why, under Subsection B, the Legislature would require an at-injury employer not offering

11

work to pay full TTD benefits if the worker declines an offer for work from another employer at or above the preinjury wage, but then, under Subsection C, permit that same at-injury employer to pay reduced TTD benefits if the worker declines an offer for work from another employer paying less than the worker's preinjury wage. We cannot countenance a construction of Section 52-1-25.1(C) that would lead to such an absurdity. *See Provisional Gov't of Santa Teresa v. Doña Ana Cnty. Bd. of Cnty. Comm'rs*, 2018-NMCA-070, ¶ 27, 429 P.3d 981 (providing that the rule that courts will not construe a statute in a manner leading to an absurd result "is equally if not more applicable as a ground for insisting on application of the words' plain meaning to *avoid* an absurdity").

{15} Ultimately, to accept Employer's interpretation and also avoid this absurdity, we would have to disregard the "long-established rule of construction prohibiting courts from reading language into a statute which is not there, particularly when it makes sense as it is written." *Faber v. King*, 2015-NMSC-015, ¶ 15, 348 P.3d 173; *see also Moya*, 2008-NMSC-004, ¶ 10 (same). We will not read into Section 52-1-25.1(C) the words "or if the worker accepts employment with another employer" or some other phrase, given that the Legislature easily could have included such language if it so intended. *See Hawkins*, 2014-NMCA-048, ¶ 14 ("It is not our place to insert language into the [Act] that does not exist. That task falls to the Legislature alone."); *see also, e.g.*, *Faber*, 2015-NMSC-015, ¶ 15 (refusing to allow for statutory

12

damages under NMSA 1978, Section 14-2-12 (1993) where the Legislature provided for them in NMSA 1978, Section 14-2-11 (1993) and could have included them in Section 14-2-12 had it so intended).

{16}     For these reasons, we reject Employer's proposed construction of Section 52-1-25.1(C) and conclude that, under the plain language, Subsection C applies only when the at-injury employer offers work at less than the worker's preinjury wage.

## II.     Legislative History of Section 52-1-25.1

{17}     As noted, Employer maintains that the offset provision in Subsection C applies to the circumstances of this case and further argues that the legislative history supports this contention. We cannot agree. Based on our review, the relevant legislative history supports the plain meaning of Section 52-1-25.1(C)—that this offset provision applies only when the at-injury employer offers work. In particular, we look to the legislative action made in response to this Court's interpretation of the 1990 version of Section 52-1-25.1 in *Grubelnik v. Four-Four, Inc.*, 2001-NMCA-056, 130 N.M. 633, 29 P.3d 533, *overruled by Gonzalez v. Performance Painting, Inc.*, 2013-NMSC-021, ¶ 39, 303 P.3d 802. *See Fowler*, 2014-NMSC-019, ¶ 13 (considering "the history, background, and overall structure of [a statute] as well as its function within a comprehensive legislative scheme" after reviewing its plain language (internal quotation marks and citation omitted)).

13

{18}    In *Grubelnik*, this Court addressed the same issue confronting us today—i.e., whether an employer not offering to rehire an injured worker could reduce TTD benefits based on less-than-preinjury wages the worker earned from another employer. *See* 2001-NMCA-056, ¶¶ 1, 9, 11. The 1990 version of Section 52-1-25.1(B) made no distinction between "the employer" and "another employer," providing in full: "If, prior to the date of [MMI], an injured worker's health care provider releases the worker to return to work and the employer offers work at the worker's pre-injury wage, the worker is not entitled to [TTD] benefits." The 1990 version of Section 52-1-25.1(C) is substantively identical to the 2005 version at issue here—providing that the offset in Subsection C applies only when "the employer offers work." *Compare* § 52-1-25.1(C) (1990), *with* § 52-1-25.1(C) (2005). Referring to both Subsections B and C, *Grubelnik* held that "[t]he plain and reasonable reading of Section 52-1-25.1 [(1990)] is that 'the employer' means the employer at the time of the injury." 2001-NMCA-056, ¶ 21. *Grubelnik* concluded by observing that the Legislature could expand Section 52-1-25.1 (1990) to include employers other than the at-injury employer if it so chose. *See* 2001-NMCA-056, ¶ 25.

{19}    Tellingly, the Legislature did just that a few years later—choosing in 2005 to modify Subsection B, *but not* Subsection C. From this, we must presume that the Legislature was aware of *Grubelnik*'s construction of the term "the employer" in

14

Section 52-1-25.1 (1990) and, accordingly, that it acted with intention when it decided not to expand Subsection C to cover the situation in which the at-injury employer fails to offer work and the worker obtains employment with another employer paying less than the worker's preinjury wage. *See Alarcon v. Albuquerque Pub. Sch. Bd. of Educ.*, 2018-NMCA-021, ¶ 5, 413 P.3d 507 ("When the Legislature amends a statute, we presume the Legislature is aware of existing law, including opinions of our appellate courts[.]"); *see also Jicarilla Apache Nation v. Rodarte*, 2004-NMSC-035, ¶ 15, 136 N.M. 630, 103 P.3d 554 (presuming that the Legislature acted "with full knowledge of, and consistent with, existing legislation" when it amended a statutory presumption but left intact a competing presumption found in another statute); *Vigil v. Thriftway Mktg. Corp.*, 1994-NMCA-009, ¶ 15, 117 N.M. 176, 870 P.2d 138 ("When dealing with a statute or rule which has been amended, the amended language must be read within the context of the previously existing language, and the old and new language, taken as a whole, comprise the intent and purpose of the statute or rule.").

{20}     Lastly, we recognize that *Grubelnik* was overruled in 2013 by our Supreme Court in *Gonzalez*, but that does not alter our analysis because we do not rely on *Grubelnik* as precedent. We rely on it only to provide context for, and insight into, the Legislature's 2005 amendment of Section 52-1-25.1 in response to that decision. *Cf.* 3C Shambie Singer, *Sutherland Statutory Construction* § 75:3 (8th ed. 2020)

15

("[W]hen a legislature amends a statute following a judicial decision construing the statute, courts presume the legislature amended the statute with that decision in mind. When a legislature enacts a statute based upon its knowledge of existing law, it is entitled to have that construction of law obtain in future interpretations of the law[.]" (footnote omitted)). And, contrary to Employer's suggestion, we do not believe that our Supreme Court's overruling of *Grubelnik* in *Gonzalez*—occurring after the Legislature amended Section 52-1-25.1 in 2005—somehow modifies the relevant legislative history of Section 52-1-25.1 or otherwise dictates that we construe Section 52-1-25.1(C) contrary to its plain meaning. Unlike this case and *Grubelnik*, the issue in *Gonzalez* was whether a worker earning *more* than his preinjury wage from a subsequent employer was entitled to permanent partial disability modifier benefits. *See* 2013-NMSC-021, ¶ 37. The statutory provision at issue in *Gonzalez* was Section 52-1-26(D) (1990), which, at the time, did not include language referencing "the employer"—the critical term this Court construed in *Grubelnik*. Instead, the statute merely provided that a worker who "returns to work at a wage equal to or greater than" his preinjury wage was not entitled to modifier benefits. *See* § 52-1-26(D) (1990).

{21}   In spite of the factual and statutory distinctions between *Gonzalez* and *Grubelnik*, the worker in *Gonzalez* analogized to *Grubelnik*, inaptly arguing that he should receive modifier benefits notwithstanding the fact he was earning more than

16

his preinjury wage from an employer other than the at-injury employer. After noting that *Grubelnik*'s reading of Section 52-1-25.1(B) (1990) "was superceded by the Legislature in 2005," our Supreme Court "overruled" *Grubelnik* and, relying on Section 52-1-25.1(B) (2005), stated in dictum that "[a] return-to-work provision is no longer contingent on returning to work for the pre-injury employer." *Gonzalez*, 2013-NMSC-021, ¶ 39. In "overruling" *Grubelnik*'s interpretation of Section 52-1-25.1(B) (1990) in light of the Legislature's explicit modification of that statutory provision, we think *Gonzalez* was simply acknowledging the obvious—i.e., that the 2005 amendment superseded *Grubelnik*'s holding that an employer still had to pay full TTD benefits even if the worker obtained employment with another employer at or above his preinjury wage. *See Grubelnik*, 2001-NMCA-056, ¶ 21. *Gonzalez*, however, did not purport to construe Section 52-1-25.1(C) (2005) in light of the 2005 amendment to Subsection B.

{22}    In short, *Gonzalez*'s overruling of *Grubelnik* has no bearing on the issue before us, and we conclude that the relevant legislative history supports the application of Section 52-1-25.1's plain meaning.

## III.    The Plain Meaning of Section 52-1-25.1 Should Be Given Effect

{23}    We next consider whether there is reason to depart from the plain meaning of Section 52-1-25.1(C) based on the goals or purposes of the Act or some other reason. *See, e.g.*, *Gurule v. Dicaperl Minerals Corp.*, 2006-NMCA-054, ¶ 7, 139 N.M. 521,

17

134 P.3d 808 (examining the legislative goals and purposes of the Act after discerning its clear meaning from the plain language). Based on our review of the Act's goals and purposes, as well as the WCJ's justifications for departing from the plain meaning, we discern none. *See Fowler*, 2014-NMSC-019, ¶ 7 (providing that "[s]tatutory language that is clear and unambiguous must be given effect" unless the result would be "absurd, unreasonable, or contrary to the spirit of the statute" (internal quotation marks and citations omitted)); *Benny*, 2007-NMCA-124, ¶ 5 (providing that the plain meaning must yield when "the language of a section of an act conflicts with an overall legislative purpose" (internal quotation marks and citation omitted)).

## A.    Legislative Purpose of the Act

{24}    The overarching purpose of the Act is "to assure the quick and efficient delivery of indemnity and medical benefits to injured and disabled workers at a reasonable cost to the employers[.]" Section 52-5-1. To fulfill this purpose, the Act enforces "a bargain in which an injured worker gives up his or her right to sue the employer for damages in return for an expedient settlement covering medical expenses and wage benefits, while the employer gives up its defenses in return for immunity from a tort claim." *Morales v. Reynolds*, 2004-NMCA-098, ¶ 6, 136 N.M. 280, 97 P.3d 612; *see also Schultz ex rel. Schultz v. Pojoaque Tribal Police Dep't*, 2014-NMCA-019, ¶ 6, 317 P.3d 866 (recognizing that the Act "represents a delicate

18

balance between the rights and interests of the worker and the employer" (internal quotation marks and citation omitted)).

{25} In our view, Section 52-1-25.1 represents an enforcement of that bargain and a balancing of interests between workers and employers. Specifically, the Legislature determined that when an employer terminates an injured worker, the employer may avoid paying TTD benefits only if the injured worker is able to find work with another employer at or above the worker's preinjury wage. *See* § 52-1-25.1(B), (C). We cannot say that the Legislature's decision in 2005 to balance the interests of employers and workers in this manner is absurd or unreasonable, and it is not up to the courts to second-guess such a choice. *See, e.g.*, *State v. Maestas*, 2007-NMSC-001, ¶ 14, 140 N.M. 836, 149 P.3d 933 ("Our role is to construe statutes as written and we should not second guess the [L]egislature's policy decisions."); *cf. Montney v. State ex rel. State Highway Dep't*, 1989-NMCA-002, ¶ 16, 108 N.M. 326, 772 P.2d 360 ("[W]e hold that where there is no statutory requirement for offset or credit or some other method to avoid overlapping or double payments, we will not do so by judicial construction.").

{26} Of particular importance to this case, and as Worker observes, the Act is designed to encourage at-injury employers to rehire injured workers so that they may reduce their reliance on compensation benefits. *See Gurule*, 2006-NMCA-054, ¶ 7; *see also* § 52-1-50.1(B) ("If an employer is hiring, that employer shall offer to rehire

19

a worker who applies for any job that pays less than the pre-injury job . . . . Compensation benefits of a worker rehired prior to [MMI] and pursuant to this subsection shall be reduced as provided in Section 52-1-25.1[.]"). This Court previously has recognized that Section 52-1-25.1(C) furthers the goals of the Act "by encouraging employers to rehire injured workers and compensating workers who return to work at less than their pre-injury wage." *Baca*, 2011-NMCA-008, ¶ 32; *see also Gurule*, 2006-NMCA-054, ¶ 7 (same). Permitting a reduction in TTD benefits, as advanced by Employer, would serve as a disincentive to employers to rehire injured workers, thus undermining, not fostering, this legislative goal. We conclude that the plain meaning of Section 52-1-25.1(C) is consistent with the goals and purposes of the Act.

**B.      The WCJ's Justifications for Limiting Worker's TTD Benefits**

{27}    Finally, we examine the WCJ's justifications for limiting Worker's TTD benefits to determine whether they provide some basis for departing from the plain meaning of Section 52-1-25.1. In determining that Worker's TTD benefits should be capped such that his earnings and TTD benefits would not exceed AWW, the WCJ largely did not rely on the statutory language or history of Section 52-1-25.1, or the legislative goals and purposes, as we have done here today; the WCJ instead cited *Livingston v. Environmental Earthscapes*, 2013-NMCA-099, 311 P.3d 1196, and Sections 52-1-47(B) (1990) and 52-1-47.1 in support of the view that it would

20

be unfair to Employer if the combination of TTD benefits and wages Worker earned from other employers exceeded AWW. As we explain, however, none of these authorities support the proposition that an injured worker is prohibited from receiving full TTD benefits when, after being terminated by the at-injury employer, the worker earned wages from another employer below the worker's preinjury wage.

{28}    We turn first to Section 52-1-47.1, which provides in relevant part:

> Unless otherwise contracted for by the worker and employer, workers' compensation benefits shall be limited so that no worker receives more in total payments, including wages and benefits from his employer, by not working than by continuing to work. Compensation benefits under the [Act] shall accordingly be reduced, if necessary, to account for any wages and employer-financed disability benefits a worker receives after the time of injury.

Section 52-1-47.1(A). The WCJ's reliance on this provision to deny Worker full TTD benefits is foreclosed by this Court's decision in *Moya*, 2007-NMCA-057. As in this case, the worker in *Moya* obtained employment with another employer after the at-injury employer terminated him without cause. *Id.* ¶¶ 2-3. Also as in this case, the WCJ in *Moya* relied on Section 52-1-47.1(A) to permit the employer, when calculating TTD benefits, to take credit for the wages the worker earned from a subsequent employer. *See Moya*, 2007-NMCA-057, ¶¶ 1, 3. This Court in *Moya* explicitly held that "Section 52-1-47.1 provides an offset *only* for wages and employer-financed benefits that the *at-injury employer* provides[,]" *Moya*, 2007-NMCA-057, ¶ 18 (emphases added), and otherwise rejected the employer's attempt

21

to skirt the plain language of Section 52-1-25.1(C), *Moya*, 2007-NMCA-057, ¶¶ 20-21.

{29} Next, we consider *Livingston*. The issue in *Livingston* was whether an injured worker who did not work after his injury could receive both permanent partial disability benefits and loss of use benefits concurrently, the combination of which exceeded the worker's AWW. 2013-NMCA-099, ¶¶ 1-2. The worker argued that the limitation in Section 52-1-47.1(A) should apply to a worker's lifetime earnings, not his weekly wages. *Livingtson*, 2013-NMCA-099, ¶ 6. Relying on various provisions of the Act, this Court disagreed, concluding that Section 52-1-47.1(A) "requires consideration of the amount of benefits a worker can receive on a weekly basis, not over the course of a lifetime[,]" *Livingston*, 2013-NMCA-099, ¶ 9, and thus held that the worker could not "recover more in benefits on a weekly basis than he was earning prior to the accident[,]" *id.* ¶ 10. *Livingston* has no bearing on this case. Worker here worked after his injury and is not seeking more than AWW in benefits. *See* § 52-1-47.1(A) (limiting "workers' compensation benefits . . . so that no worker receives more in total payments, including wages and benefits from his employer, by *not* working than by continuing to work" (emphasis added)). Moreover, as previously explained, Section 52-1-47.1 "does not allow an offset for wages paid by a subsequent employer[,]" as is the case here. *Moya*, 2007-NMCA-057, ¶ 18.

22

**{30}** Lastly, Section 52-1-47(B) (1990) is inapposite. That provision provides that "compensation benefits [other than lifetime benefits awarded pursuant to Section 52-1-41] for any combination of disabilities or any combination of disabilities and death shall not exceed an amount equal to seven hundred multiplied by the maximum weekly compensation payable at the time of the accidental injury[.]" Section 52-1-47(B) (1990) simply does not apply to this case because there is no contention that Worker's benefits exceeded any limitation in that statutory provision.

**{31}** Having determined that the authority relied on by the WCJ to limit Worker's TTD benefits is inapposite, we observe that Employer makes little effort to defend the WCJ's reliance on these authorities. Employer admits that "Section 52-1-47.1 is not applicable to the case at hand." As for *Livingston* and Section 52-1-47(B) (1990), Employer agrees that those authorities do not "directly apply" to the facts of this case, but asserts they "demonstrate the overarching principle" that TTD benefits may be limited under certain circumstances. Thus, according to Employer, they support the WCJ's concern for fairness.

**{32}** The problem with the WCJ's disregard of the plain language of Section 52-1-25.1(C) in favor of fairness, however, is that there is no need to resort to principles of "fundamental fairness" when construing the Act if the Legislature has provided clear guidance in the statute itself. *See Gurule*, 2006-NMCA-054, ¶ 11 ("Absent an ambiguity, there is no need to undertake a fundamental fairness analysis."); *Ortiz*,

23

1996-NMCA-097, ¶¶ 9-11 (observing that where the Act provides no guidance in addressing the question at issue, resort to "fundamental fairness" is appropriate). *Ortiz* is instructive on this point. In that case, the employer fired the worker for misconduct that culminated in an accident resulting in the worker's compensable injury and did not afterwards offer her work. *Ortiz*, 1996-NMCA-097, ¶¶ 2, 8. The issue in *Ortiz* was whether, notwithstanding the plain language of the 1990 version of Section 52-1-25.1, which required the employer to offer work before denying or reducing TTD benefits, the employer could refuse to pay TTD benefits because the worker was terminated for cause. *See Ortiz*, 1996-NMCA-097, ¶¶ 5-6. Recognizing that neither Subsection B nor Subsection C of Section 52-1-25.1 explicitly permitted the employer to deny full payment of TTD benefits under the circumstances, the employer urged this Court to rule in its favor on grounds of fundamental fairness. *Ortiz*, 1996-NMCA-097, ¶ 9. This Court rejected the employer's invitation, holding that Section 52-1-25.1 (1990), which "cover[ed] the issue before us[,]" required payment of full TTD benefits because neither of the exceptions to full payment of TTD benefits applied. *Ortiz*, 1996-NMCA-097, ¶ 10.

{33}     Just as in *Ortiz*, there is no ambiguity in the plain language of Section 52-1-25.1(C). Because the Legislature determined how to fairly balance the interests of employers and workers under the circumstances of this case when it enacted Subsection C, the WCJ's resort to principles of fairness upset the balance the

24

Legislature struck. *See Ortiz*, 1996-NMCA-097, ¶ 13 ("Policy arguments may assist us in understanding statutory language, but they cannot substitute for the legislative text. We find no basis in the language of the . . . Act to carve out another exception."). In short, we conclude the WCJ's justifications for limiting Worker's TTD benefits are without merit and the WCJ's reduction of Worker's benefits was therefore erroneous.

**CONCLUSION**

{34} For the foregoing reasons, we hold that Section 52-1-25.1 should be given effect as written. Employer thus is not entitled to the offset in Section 52-1-25.1(C) and is required to pay Worker full TTD benefits for the weeks in which he earned less than AWW from subsequent employers. We therefore reverse and remand with instructions to the WCJ to vacate the compensation order and to enter an amended compensation order consistent with this opinion.

{35} **IT IS SO ORDERED.**

_____
**JENNIFER L. ATTREP, Judge**

**WE CONCUR:**

_____
**BRIANA H. ZAMORA, Judge**

_____

25

**ZACHARY A. IVES, Judge**