Certiorari Denied, March 30, 2011, No. 32,904

IN THE COURT OF APPEALS OF THE STATE OF NEW MEXICO

Opinion Number: 2011-NMCA-034

Filing Date:  February 9, 2011

Docket No. 29,622

MARC PEARSON,

 Worker-Appellant,

v.

JOHNSON CONTROLS, NORTHERN
N.M., LLC, JOHNSON CONTROL, INC.
and OHMS (TPA),

 Employer/Insurer-Appellee,

and

MARC PEARSON,

 Worker-Appellant,

v.

KELLOGG BROWN and ROOT, INC., SHAW
INFRASTRUCTURES, INC., LOS ALAMOS
TECHNICAL ASSOCIATES, INC. (KSL), and
CANNON CORCHRAN MANAGEMENT
SERVICES, INC. (TPA),

 Employer/Insurer-Appellee.

APPEAL FROM THE WORKERS' COMPENSATION ADMINISTRATION
Gregory D. Griego, Workers' Compensation Judge

Donald D. Vigil, P.C.
Donald D. Vigil
Albuquerque, NM

1

for Appellant

David L. Skinner, P.C.
David L. Skinner
Albuquerque, NM

for Appellee

**OPINION**

**KENNEDY, Judge.**

**{1}**    In this case, we hold that the standard of wilfulness required to deny workers' compensation benefits to an employee for self injury is the same as applied to employers under *Delgado v. Phelps Dodge Chino, Inc.*, 2001-NMSC-034, ¶ 1, 131 N.M. 272, 34 P.3d 1148. Marc Pearson (Worker) appeals a workers' compensation order in which the workers' compensation judge (WCJ) found him responsible for wilful self-exposure to toxic welding fumes under NMSA 1978, Section 52-3-45 (1953). The WCJ relied on depositions, letters, and other evidence indicating that Worker's doctors cautioned him that continued welding might exacerbate his preexisting lung condition. As such, the court denied Worker benefits for his lung condition because it found that he recklessly disregarded the risks involved in continued employment as a welder. On appeal, Worker argues that his actions are not legally sufficient to constitute wilful self-exposure and that the WCJ's findings are unsupported on whole record review. We agree. Under the standard announced in *Delgado*, Worker's decision to continue welding despite his doctors' warnings does not constitute a wilful act. 2001-NMSC-034, ¶ 1. We reverse the order of the WCJ below.

**BACKGROUND**

**{2}**    Worker left high school in the eleventh grade to pursue a career as a plumber, pipe fitter, and welder. He attended trade school for that purpose, and at the time of trial, he had worked in those industries for more than thirty-two years. Throughout Worker's career, he held positions as a pipe rigger, pipe fitter, welder, arc machine welder, plumber, and construction worker. However, as Worker testified, he has always primarily considered himself a welder.

**{3}**    On October 7, 2002, Worker was employed as a welder by Johnson Controls Northern N.M., LLC; Johnson Control, Inc.; OHMS; Kellogg, Brown & Root, Inc.; Shaw Infrastructures, Inc.; Los Alamos Technical Associates, Inc.; and CCMSI (collectively Employers) when he suffered the lung injury that forms the basis for this appeal. Worker and his crew were directed to weld seismic braces in a poorly ventilated pump house at Los Alamos National Laboratory. The braces were pre-painted and treated with an epoxy finish, which emitted fumes when subjected to the heat of a welding torch. Worker had been

2

diagnosed with a chronic lung condition from previous exposures to such fumes, but as a result of his exposure in October 2002 his condition worsened to the point that he could no longer tolerate welding. On August 20, 2003, Worker filed a workers' compensation claim for his lung injury. That claim was stayed for a period of time and later consolidated with claims for separate injuries, which are outside the scope of this appeal. On February 27, 2009, the matter came before WCJ Gregory Griego for a trial on the merits. The court considered Worker's medical records, the depositions of several treating physicians, other documentary exhibits, and the testimony of Worker himself.

{4}     As his medical records indicate, in June 1998 Worker was serving as a welder on a job in Fort Collins, Colorado, when he suffered his first bout of fume exposure. On that occasion, he was taken to the emergency room and received treatment for breathing problems. In Worker's medical file, the treating physician wrote, "I advised the patient that he needed to be very careful about exposure to the welding fumes and that he really needed to pay attention to respiratory protection and ventilation." After Worker's release, his job required him to continue welding in a low-ventilation environment for several months until he finally had "had enough," resigned his position in Fort Collins, and returned to New Mexico.

{5}     Worker again sought treatment upon returning to New Mexico, this time at Southwest Pulmonary Specialists, where Dr. Kenneth Kalassian (Dr. Kalassian) cared for him on several occasions. On September 24, 1998, Dr. Kalassian diagnosed Worker with "metal fume fever" and observed Worker's "history of exposure to volatile fumes." Dr. Kalassian wrote that "[t]he patient has been instructed to refrain from exposure to any volatile substances that may aggravate his underlying lung disease." He further stated that "[t]oward this end, a letter will be generated to the patient's employer stating that exposure to hazardous volatiles could severely compromise the patient's health." Dr. Kalassian treated Worker again on November 16, 1998. In his notes from that date, he stated, "The patient has once again been highly cautioned to avoid volatile substances such as those he has been exposed to in the past in the work place. He has recently undertaken efforts to undergo job retraining." One month later, Dr. Kalassian again "counseled [the patient] regarding the need to avoid hazardous exposures particularly indoor welding."

{6}     Dr. Matthew Montoya (Dr. Montoya) replaced Dr. Kalassian in February 1999 as Worker's treating physician at Southwest Pulmonary Specialists. During the following month, on March 23, 1999, Dr. Montoya described his ongoing treatment of Worker's "chronic fume exposure" condition. His notes from that date state that Dr. Montoya agreed with "Dr. Kalassian's previous recommendations [that] the patient needs to get out of welding as the fumes will continue to cause exacerbations." Dr. Montoya also stated that Worker "has noted that with continued welding and exposure he [experiences breathing problems,]" and that he agreed "with [Worker's] plan to get some retraining for a different job." In a May 19, 1999 letter, Dr. Montoya wrote that Worker should "be removed from exposure [to the] causative agent or other agents with similar sensitizing properties in order to avoid further attacks and chronic disease." Then, in August 1999 Dr. Montoya described

3

Worker's condition as "reactive airway disease with chronic exacerbation from environmental occupational fume exposure" and observed that "[d]ue to the severity of [Worker's] lung disease and the high probability that he will never be able to return to his chosen career field, we have recommended that he seek a second opinion with Dr. Rose in Denver, Colorado[.]" The evidence then reflects that Dr. Cecilia Rose (Dr. Rose) conducted a comprehensive evaluation of Worker's "respiratory and systemic symptoms . . . associated with welding in a confined space." However, we are unable to locate any final diagnosis or recommendation in the record.

{7}     While receiving the above-mentioned treatment, throughout 1998 and 1999, Worker took several non-welding jobs in an attempt to prevent exposure to welding fumes. Nevertheless, financial pressures caused him time and again to take welding jobs as well. Although such stints as a welder seem to roughly coincide with the onset of his lung irritations and symptoms during this period, we note that the record also indicates times after Worker's diagnosis when he worked as a welder with no problems whatsoever.

{8}     In the last relevant medical record entry prior to Worker's accident, Dr. Montoya wrote, "Patient doing quite well as long as he stays away from fumes and cigarette smoke." There are no pertinent medical entries between 2001 and October 2002, when Worker was injured. Several subsequent documents entered as evidence demonstrate Worker continued to receive warnings that welding might cause a worsening of his condition. Although we do not consider those here because they came after Worker's October 2002 accident, we note that Worker was not definitively ordered to stop welding by his doctors until February 2003.

{9}     The WCJ also considered Worker's own testimony. Worker began by describing his professional history and training as outlined above. He testified at some length regarding how he alternated between welding and non-welding jobs when he experienced a flare-up of his lung condition throughout his career. Worker testified that his lung condition would sometimes give him trouble when he was welding, but he made it clear that it did not always do so. As to warnings from his doctors about the hazards of welding and toxic fumes, he stated that he did receive such warnings. However, Worker qualified this admission by describing how such warnings were general and non-specific. Moreover, despite such warnings, his doctors always released him to return to welding. For instance, Worker testified that although both Drs. Kalassian and Montoya recommended he might want to try other types of work that did not involve welding or toxic fumes, neither doctor actually advised him to stop welding. As such, Worker stated it was his belief that his doctors were simply advising him on less hazardous career possibilities. We find no evidence in the record to suggest Worker actually knew he was being ordered to stop welding altogether.

{10}     Worker also described the events leading up to his October 7, 2002, Los Alamos fume exposure. In doing so, he discussed how he and the members of his crew were ordered to weld seismic braces in a poorly ventilated pump house area. When the crew discovered the braces had been pre-treated with paint and epoxy, they objected to welding them on the basis that such treatments would produce hazardous smoke. Nevertheless, Worker testified,

Employers ordered the crew to weld the braces anyway, although Employers did take measures to reduce the fumes by installing ventilators and fans. Worker also testified that Employers knew of his chronic lung condition at the time they hired him. Employers dispute this assertion.

{11} The WCJ issued the compensation order at issue in this appeal on May 29, 2009. It found that Worker had continued to seek employment as a welder in reckless disregard of several warnings by his physicians. Thus, the WCJ concluded, Worker's actions constituted wilful self-exposure under Section 52-3-45 and prohibited him from receiving compensation for his injury. As the court observed, "Worker persisted in his exposure to welding fumes in disregard of medical advice that continued fume exposure would result in injury."

{12} On appeal, Worker argues this result was error. He argues the facts do not support a finding of wilful self-exposure under Section 52-3-45, and furthermore, even if his actions can be classified as wilful, he possessed a reasonable justification that makes compensation proper. Employers contend whole record review requires this Court to affirm.

DISCUSSION

A.      Standard of Review

{13} This Court reviews workers' compensation orders under a whole record standard. *Moya v. City of Albuquerque*, 2008-NMSC-004, ¶ 6, 143 N.M. 258, 175 P.3d 926. In doing so, we consider "all the evidence bearing on the WCJ's decision in order to determine if there is substantial evidence to support the result." *Flores v. McKay Oil Corp.*, 2008-NMCA-123, ¶ 7, 144 N.M. 782, 192 P.3d 777, *cert. quashed*, 2009-NMCERT-003, 146 N.M. 604, 213 P.3d 508. We will not substitute our judgment for that of the workers' compensation judge below, despite the fact that "the evidence may support inconsistent findings." *Herman v. Miners' Hosp.*, 111 N.M. 550, 552, 807 P.2d 734, 736 (1991). So long as the WCJ's findings are supported by substantial evidence on the record as a whole, we accord them deference. *Id.* Nevertheless, "[w]e review the WCJ's application of the law to the facts de novo." *Leonard v. Payday Prof'l*, 2007-NMCA-128, ¶ 10, 142 N.M. 605, 168 P.3d 177.

B.      Application of Section 52-3-45

{14} As this Court has observed many times, the New Mexico Workers' Compensation Act (the Act) strikes a balance between the interests of workers and employers. *See* NMSA 1978, §§ 52-1-1 to -70 (1987, as amended through 2007); *Delgado*, 2001-NMSC-034, ¶ 12. Under the Act, "[w]hen a worker suffers an accidental injury and a number of other preconditions are satisfied," he receives compensation "quickly, without having to endure the rigors of litigation or prove" the employer's culpability. *Delgado*, 2001-NMSC-034, ¶ 12. In return for granting such swift compensation, the employer "is assured that a worker accidentally injured, even by the employer's own negligence, will be limited to

5

compensation under the Act and may not pursue the unpredictable damages available outside its boundaries." *Id.* In order to maintain the proper balance, however, it is vitally important that workers' injuries be accidental, *see* § 52-1-9(C), and our courts have defined an accidental injury as an "unlooked-for mishap or . . . untoward event that is not expected or designed." *Delgado*, 2001-NMSC-034, ¶¶ 13-14 (internal quotation marks and citation omitted). Thus, any injury caused by wilful conduct is by definition non-accidental and non-compensable. *Id.* ¶¶ 20, 26. If it were not so, the Act would unfairly require employers to pay when a worker intentionally injured himself and would deny workers a remedy in tort when their employers intentionally injured them.

{15}    To this end, the Act disallows compensation to any worker who wilfully self-exposes himself to the hazard responsible for his injury. Section 52-3-45; *see* § 52-1-11. To our knowledge, the courts have not yet been called to interpret Section 52-3-45 and specifically, what conduct might qualify as "wilful self-exposure." In *Delgado*, however, our Supreme Court defined in detail the term "wilful," as that term is used in the Act. 2001-NMSC-034, ¶ 1 (defining wilful in the context of Section 52-1-11 but applying it more broadly "[f]or purposes of the Act"). We therefore hold that *Delgado* provides the proper definition in the instant matter.[1] Under *Delgado*, a party acts wilfully when

> (1) the worker or employer engages in an intentional act or omission, without just cause or excuse, that is reasonably expected to result in the injury suffered by the worker; (2) the worker or employer expects the injury to occur, or has utterly disregarded the consequences of the intentional act or omission; and (3) the intentional act or omission proximately causes the worker's injury.

2001-NMSC-034, ¶ 1. Parties must shoulder a high burden to prove their opponent's wilfulness under *Delgado*. *Chairez v. James Hamilton Constr. Co.*, 2009-NMCA-093, ¶ 30, 146 N.M. 794, 215 P.3d 732, *cert. denied*, 2009-NMCERT-007, 147 N.M. 362, 223 P.3d 359. Not only must a party proffer evidence meeting each of *Delgado's* three elements, but they must also demonstrate their opponent acted unconscionably and with "a comparable degree of egregiousness as the employer in *Delgado*." *Morales v. Reynolds*, 2004-NMCA-098, ¶¶ 10, 14, 136 N.M. 280, 97 P.3d 612; *see Salazar v. Torres*, 2007-NMSC-019, ¶ 14, 141 N.M. 559, 158 P.3d 449; *Chairez*, 2009-NMCA-093, ¶ 30.

{16}    The conduct at issue in *Delgado* was indeed egregious. There, the employer doomed a worker to almost certain death by ordering him to conduct emergency repairs on an iron cauldron threatening to overflow with superheated molten rock. 2001-NMSC-034, ¶¶ 3-5. The worker protested, arguing he "was neither qualified nor able" to proceed alone as directed. *Id.* ¶ 5. But the employer insisted, whereupon the worker did as he was told and was quickly consumed by flames. *Id.* He died a few weeks later from his burns, which

---

[1] Both parties agree with this Court that *Delgado's* definition of "wilful" controls in this case.

covered his entire body. *Id.* As this Court has observed, the employer's acts in *Delgado* stemmed from "egregious employer conduct: a combination of deadly conditions, profit-motivated disregard for easily implemented safety measures, complete lack of worker training or preparation, and outright denial of assistance to a worker in a terrifying situation." *Morales*, 2004-NMCA-098, ¶ 10.

**{17}** On several occasions since *Delgado*, our courts have analyzed whether specific instances of employer conduct met the required level of egregiousness demanded by that standard. For instance, in *Morales*, the worker was injured when he was ordered to work on a pump containing a hazardous chemical. While repairing the pump, some of the chemical was released and caused the hood of his protective gear to malfunction, injuring him. *Id.* ¶ 2. The court considered evidence that employer knew repairing the pump in this way posed at least some danger of a protective gear malfunction. Evidence was also presented that employer knew of other equipment that might have been safer but chose to forego it. *Id.* ¶ 22. In that case this Court held that "the events that occurred . . . do not approach the type of incidents that *Delgado* sought to prevent. The acts or omissions that [the worker] argues did not cause the injurious event in the way that the acts of the employer in *Delgado* caused Delgado to be set on fire." *Morales*, 2004-NMCA-098, ¶ 24.

**{18}** This Court reached a similar result in *Chairez*. In that case, the employer made an after-market modification to a rock-crushing machine, which exposed a dangerous portion of its engine and resulted in worker's injury. *Chairez*, 2009-NMCA-093, ¶¶ 8-10. Yet we held that "the gravity of the harm and the certainty of injury . . . does not approach the level required by *Delgado*." *Chairez*, 2009-NMCA-093, ¶ 33. Likewise, in *Dominguez v. Perovich Properties, Inc.*, we held that an employer's failure to provide safety equipment and safety standards to prevent a worker's injury did not meet the requirements of *Delgado*, even though the worker's injury was arguably foreseeable. *Dominguez*, 2005-NMCA-050, ¶ 21, 137 N.M. 401, 111 P.3d 721; *see Fuerschbach v. Sw. Airlines Co.*, 439 F.3d 1197, 1213 (10th Cir. 2006) (holding that a worker suffered an accidental injury when her coworkers "arrested" her as part of a prank to commemorate her graduation from probationary to regular employment status).

**{19}** As these opinions and many others demonstrate, the usual scenario in this type of case involves a worker's use of *Delgado* to expose the employer to liability in tort; and because *Delgado* offers such a narrow exception, that technique rarely succeeds. *See, e.g.*, *Chairez*, 2009-NMCA-093, ¶ 30. It is unusual, then, for us to see a case like the one at bar in which the employer deploys *Delgado* for the purpose of moving a worker's conduct *outside* the Act. Indeed, we are not aware of cases in which that has happened. Be that as it may, our Supreme Court has made *Delgado* applicable to both workers and employers. 2001-NMSC-034, ¶ 26. In the instant case, our precedents dictate that Worker's conduct, although inarguably unwise and almost certainly negligent, is not the type of egregious behavior leading to almost certain injury that *Delgado* seeks to exclude from workers' compensation.

**{20}** By our count, prior to Worker's injury on October 7, 2002, his doctors made

7

statements about his need to refrain from exposing himself to welding fumes on at least seven separate occasions. From his medical records and employment history, it is likewise clear that although he sometimes welded without a problem, his work as a welder correlated closely with the intermittent onset and/or intensification of his symptoms. Under these circumstances, we conclude that a reasonable person, armed with the knowledge available to Worker in October 2002, would find Worker's injury to flow naturally from his intentional act to continue welding. *See id.* ¶ 27. It is similarly clear that Worker's decision to continue welding proximately caused his injury. *See also id.* ¶ 29; *Tallman v. ABF (Ark. Best Freight)*, 108 N.M. 124, 132-33, 767 P.2d 363, 371-72 (Ct. App. 1988) (requiring a causal connection between a worker's wilful conduct and his injury to preclude recovery); *see also* UJI 13-305 NMRA (describing proximate cause as an act that "contributes to bringing about the injury" and is "reasonably connected as a significant link to the injury").

**{21}** Nevertheless, the evidence below was insufficient to establish Worker's subjective appreciation of the risk under *Delgado*. Under that standard, Employer was required to prove that Worker "decided to engage in the act or omission without ever considering its consequences . . . . If, on the other hand, [he] . . . did consider the consequences of the act or omission, this prong will be satisfied only when [he] expected the injury to occur." *Delgado*, 2001-NMSC-034, ¶ 28; *see Tallman*, 108 N.M. at 133, 767 P.2d at 372 (requiring "knowledge of the peril and the ability to foresee the injury for which [his conduct] is to blame"). In the trial below, Employer presented no such evidence. In fact, the weight of the evidence on the whole record appears to be quite to the contrary. It demonstrates that Worker thought his doctors' warnings were inconsistent and that none ever advised him to stop welding outright prior to October 2002.

**{22}** Most importantly, Worker's actions, in light of the gravity of the harm involved, do not rise to the egregious, unconscionable level of certainty required by *Delgado*. *Chairez*, 2009-NMCA-093, ¶ 33; *see Morales*, 2004-NMCA-098, ¶ 10. Here, Worker possessed knowledge of his special sensitivity to fumes and received generalized warnings regarding the dangers of continued employment as a welder. There is no evidence he was ever definitively advised to end his career as a welder prior to October 2002, and it is similarly clear that he had sometimes worked as a welder without the occurrence of a fume exposure or a flare-up of his lung condition. Worker's choice in continuing to weld therefore does not present the type of situation in which he wilfully faced almost certain injury. His actions, though they may fall below a standard of ordinary care, are at most negligent. Thus, Worker's decision fails to satisfy *Delgado's* narrow exception to the general rule that accidental injuries remain within the Act. *Delgado* was written with a view to the overarching notion of balance. 2001-NMSC-034, ¶ 12, 24 ("[E]mployers . . . must be held to the same standard of conduct, and suffer equivalent consequences . . . as workers."). Accordingly, this Court would be remiss if it did not apply the same high standard to workers' conduct as it has done many times to the negligence of employers.

**CONCLUSION**

**{23}** The WCJ misapplied the law in this case; and we reverse and remand for further

8

proceedings consistent with this opinion.  Because we reverse, we have no need to consider any other possible grounds for reversal, including Worker's argument that he possessed just cause or excuse to continue welding or that Employers were aware of his lung problems at the time of hire.

**{24}    IT IS SO ORDERED.**

 

 

                                           **RODERICK T. KENNEDY, Judge**

**WE CONCUR:**

 

**MICHAEL D. BUSTAMANTE, Judge**

 

**LINDA M. VANZI, Judge**

**Topic Index for *Pearson v. Johnson Controls*, Docket No. 29,622**

| **AE** | **APPEAL AND ERROR** |
|---|---|
| AE-SR | Standard of Review |

| **WC** | **WORKERS COMPENSATION** |
|---|---|
| WC-II | Intentional Injury |
| WC-PE | Pre-Existing Condition |
| WC-WG | Workers' Compensation, General |