The slip opinion is the first version of an opinion released by the Clerk of the Court of Appeals. Once an opinion is selected for publication by the Court, it is assigned a vendor-neutral citation by the Clerk of the Court for compliance with Rule 23-112 NMRA, authenticated and formally published. The slip opinion may contain deviations from the formal authenticated opinion.

# IN THE COURT OF APPEALS OF THE STATE OF NEW MEXICO

Opinion Number: _____

Filing Date: **December 21, 2023**

**No. A-1-CA-39609**

**GABRIELA MARTIN,**

Worker-Appellant,

v.

**NEW MEXICO MUTUAL CASUALTY COMPANY, Self-Insured c/o INTEGRION GROUP,**

Employer/Insurer-Appellee.

**APPEAL FROM THE WORKERS' COMPENSATION ADMINISTRATION**
**Anthony Couture, Workers' Compensation Judge**

Pizzonia Law, LLC
Lydia Pizzonia
Albuquerque, NM

for Appellant

Barry J. Berenberg, Senior Counsel
Albuquerque, NM

for Appellee

**OPINION**

**ATTREP, Chief Judge.**

{1}    Gabriela Martin (Worker) appeals from a compensation order entered pursuant to the Workers' Compensation Act (the Act), NMSA 1978, §§ 52-1-1 to -70 (1929, as amended through 2017). The Workers' Compensation Judge (WCJ) determined that Worker was not entitled to temporary total disability (TTD) benefits or permanent partial disability (PPD) modifier benefits because Worker was terminated from her employment for misconduct unrelated to her workplace injury. The core dispute in this case concerns the meaning of "misconduct," as that term is used in Section 52-1-25.1(D)(3) (TTD benefits) and Section 52-1-26(D)(4) (PPD modifier benefits). Specifically, we are called on to address whether the term "misconduct" in those sections is to be given its plain, ordinary meaning, or whether, as Worker requests, it should be construed in favor of workers to mean "willful misconduct," as is required in the unemployment compensation context. We hold that, for purposes of Sections 52-1-25.1(D)(3) and 52-1-26(D)(4), "misconduct" is to be given its plain, ordinary meaning: "improper behavior." Because we reject Worker's request to adopt a definition of misconduct more favorable to her, and because Worker's remaining arguments are predicated on us adopting such a definition, we affirm.

**BACKGROUND**

{2}     Before setting out the relevant factual and procedural background, we first provide an overview of the relevant statutory background for context.

**I.     Statutory Background**

{3}     Under Section 52-1-25.1, a worker who has experienced an accidental workplace injury may be eligible for TTD benefits if, because of that injury, they are unable to "perform the duties of that employment" before reaching maximum medical improvement (MMI). Section 52-1-25.1(A). Following MMI, the injured worker may be eligible for PPD benefits under Section 52-1-26 "if the worker has suffered a 'permanent impairment.'" *Hawkins v. McDonald's*, 2014-NMCA-048, ¶ 20, 323 P.3d 932 (quoting Section 52-1-26(B) (1990, amended 2017)). PPD benefits are "determined by calculating the worker's impairment," which may be increased through statutory modifiers based on the worker's age, education, and physical capacity. Section 52-1-26(C).

{4}     Prior to 2017, an injured worker otherwise entitled to TTD benefits could be denied those benefits under Section 52-1-25.1 if: "(1) the employer offer[ed] work at the worker's preinjury wage; or (2) the worker accept[ed] employment with another employer at the worker's preinjury wage." Section 52-1-25.1(B) (2005, amended 2017); *see also Ruiz v. Los Lunas Pub. Schs*., 2013-NMCA-085, ¶¶ 22-23, 308 P.3d 983 (concluding that a worker was still eligible for TTD benefits despite

2

rejecting her employer's job offers because "medical testing later established that" her release to return to work "was premature and that [the w]orker was in fact unable to return to work at the time [the e]mployer made its job offers"). Similarly, prior to 2017, an employer was relieved of paying PPD modifier benefits under Section 52-1-26 if "on or after the date of [MMI, the] worker return[ed] to work at a wage equal to or greater than the worker's pre-injury wage." Section 52-1-26(D) (1990, amended 2017); *see also Cordova v. KSL-Union*, 2012-NMCA-083, ¶ 13, 285 P.3d 686 (providing that Section 52-1-26 (1990, amended 2017) has been construed as relieving an employer of having to pay PPD modifier benefits if the worker accepts employment at or above the pre-injury wage or "unreasonably refuses offered employment at or above [their] pre-injury wage"). Based on these statutory limitations, this Court in *Hawkins* held that "termination of post-injury employment, whether or not for misconduct, does not affect [a worker's] right to recover TTD benefits." 2014-NMCA-048, ¶ 1. *Hawkins* also disavowed "that the level of employee misconduct plays any role in the calculation of" PPD modifier benefits, *id.* ¶ 23, holding that such benefits may be denied only "if a worker, through voluntary conduct unconnected with [their] injury, takes [themselves] out of the labor market," *id.* ¶ 24 (internal quotation marks and citation omitted).

{5} In an apparent response to *Hawkins*, the Legislature amended both Section 52-1-25.1 and Section 52-1-26 in 2017. *See Hawkins*, 2014-NMCA-048, ¶ 14 ("It is

not our place to insert language into the [Act] that does not exist. That task falls to the Legislature alone."); *see also* 3C Shambie Singer, *Sutherland Statutory Construction* § 75:3 (8th ed. 2023) ("[W]hen a legislature amends a statute following a judicial decision construing the statute, courts presume the legislature amended the statute with that decision in mind."). Following the 2017 amendments, an injured worker is not entitled to TTD or PPD modifier benefits if "the worker is terminated for misconduct connected with the employment that is unrelated to the workplace injury [or accident]."[1] *See* §§ 52-1-25.1(D)(3), -26(D)(4). The terminated worker, however, continues to be eligible for other workers' compensation benefits, including medical benefits and PPD benefits without modifiers. *See* § 52-1-25.1(F) (providing that an "employer shall continue to provide reasonable and necessary medical care pursuant to Section 52-1-49" even if a worker is terminated for misconduct); § 52-1-26(D) (providing that a worker will receive a PPD rating "equal to the worker's impairment" even if they are ineligible for PPD modifier benefits due to their termination for misconduct); § 52-1-42(A)(1), (2) (providing that a worker may receive up to 700 weeks of PPD benefits, depending on their percentage of disability). Further, a terminated worker's misconduct will not result in the

---

[1]The quoted language in Section 52-1-25.1(D)(3) and Section 52-1-26(D)(4) is identical with the exception that the word "injury" in Section 52-1-25.1(D)(3) is replaced with "accident" in Section 52-1-26(D)(4). The parties do not ask us to draw any significance or meaning from this difference. We therefore assume, for purposes of this opinion, that there is none.

4

forfeiture of TTD and PPD modifier benefits if the WCJ finds that an employer terminated the worker for "pretextual reasons" to avoid paying benefits to the worker or "as retaliation against the worker for seeking benefits." *See* §§ 52-1-25.1(D)(3), -26(D)(4). Under such circumstances, penalties and fines also may be assessed against the employer. *See* §§ 52-1-25.1(E), -26(E), -28.1(B), -28.2(B)-(D).

## II.     Factual and Procedural Background

{6}     Worker began working as a claims processing clerk for New Mexico Mutual Casualty Company (Employer) in July 2017. In October 2017, Worker experienced a repetitive use injury and filed a notice of injury. Employer provided appropriate medical care, and Worker continued to work for Employer as a claims processing clerk.

{7}     In December 2017, Employer placed Worker on a performance improvement plan for sixty days due to work performance issues. Although Worker successfully completed the plan, Employer, in March 2018, rated Worker as an "[i]nconsistent [p]erformer" in a 2017 performance review. Worker continued working for Employer until July 2018, when she was terminated for continued deficiencies in work performance, including excessive tardiness and failing to complete tasks on time.[2]

---

[2]Following her termination, Worker applied for unemployment compensation benefits. In August 2018, the Department of Workforce Solutions determined that Worker was entitled to unemployment compensation because she was terminated for

**{8}** In August 2019, over one year after her termination, Worker filed a workers' compensation complaint based on a doctor's order providing that Worker could no longer work at a desk or use a keyboard for long periods of time—thereby preventing her from performing her usual and customary job duties. Worker sought TTD benefits until reaching MMI; PPD benefits, including modifiers, after reaching MMI; and medical benefits. Employer's informal response to Worker's complaint indicated its belief that Worker was ineligible for TTD benefits in part because she had been "terminated for misconduct unrelated to her . . . injury." In the pretrial order, the parties specifically contested the meaning of "misconduct," as that term is used in Sections 52-1-25.1(D)(3) and 52-1-26(D)(4), and whether Worker was terminated for "misconduct."

**{9}** Following trial, the WCJ entered a compensation order. The WCJ determined that Worker suffered a compensable workplace injury, but that Worker's termination "was reasonable and for misconduct unrelated to the workplace injury" and "was not pretextual or retaliatory." In support, the WCJ found that "Worker was excessively tardy," and "Worker's personnel file showed a clear pattern of poor performance." In terms of poor performance, the WCJ found, among other things, that "Worker failed to process five [Centers for Medicare and Medicaid Services (CMS)]

---

failing to meet Employer's work expectations, but not because of "misconduct." Apparently, Employer did not dispute Worker's entitlement to unemployment compensation benefits.

documents in a timely manner," and "[a]s a result, Employer was fined by CMS and had to waive certain defenses in its dispute with CMS."[3] The WCJ concluded that Worker was entitled to medical care and expenses and PPD benefits in the form of a one percent whole person impairment rating, but that, due to her termination for misconduct unrelated to her workplace injury, Worker was not entitled to PPD modifier benefits or TTD benefits.[4] Worker appeals.

**DISCUSSION**

{10}    Worker argues that the WCJ erred by applying the wrong definition of "misconduct" in Sections 52-1-25.1(D)(3) and 52-1-26(D)(4), which Worker

---

[3]Although Worker purports to challenge the WCJ's ultimate determination that Worker's termination was for "misconduct," she does not challenge the sufficiency of the evidence to support any of the specific findings of fact by the WCJ to support that ultimate determination. These findings accordingly are binding on appeal. *See Baker v. Endeavor Servs., Inc.*, 2018-NMSC-035, ¶ 2, 428 P.3d 265 ("Unchallenged findings of fact are binding on [an appellate court].").

[4]The WCJ did not expressly rule on the issue of whether Worker was entitled to TTD benefits. Nor did the WCJ expressly state how he was construing the term "misconduct." The judge did, however, explain in the compensation order that he was rejecting any proposed conclusions of law not expressly adopted. In Worker's proposed conclusions of law, she requested the WCJ to conclude that she was entitled to TTD benefits and to construe "misconduct" in the same manner as that term is used in the unemployment compensation context. By rejecting these proposed conclusions of law, the WCJ ruled against Worker on these matters. *See Landskroner v. McClure*, 1988-NMSC-091, ¶ 9, 107 N.M. 773, 765 P.2d 189 (providing that "[f]ailure of the court to find as requested is treated as a finding against the party asserting the affirmative"); *Crutchfield v. N.M. Dep't of Tax'n & Revenue*, 2005-NMCA-022, ¶ 31, 137 N.M. 26, 106 P.3d 1273 (providing that issues not addressed in the lower court's findings of fact and conclusions of law were implicitly decided against the requesting party).

7

contends should be construed in workers' favor to require "willful misconduct" (i.e., deliberate or wanton misbehavior), as is required in the unemployment compensation context. Based on this proposed meaning, Worker argues that substantial evidence does not support the WCJ's determination that she was terminated for misconduct. Worker additionally contends that the WCJ erred by not deeming as admitted Employer's untimely responses to Worker's requests for admission. We hold that, for purposes of Sections 52-1-25.1(D)(3) and 52-1-26(D)(4), "misconduct" should be given its plain, ordinary meaning—i.e., "improper behavior." Given this holding, we reject Worker's argument that the WCJ erred by applying the wrong definition. Because Worker's remaining arguments are predicated on us adopting a different definition of misconduct, we reject those arguments as well.

**I. The Meaning of "Misconduct" in Sections 52-1-25.1(D)(3) and 52-1-26(D)(4)**

{11} The central issue in this case—the meaning of "misconduct" as used in Sections 52-1-25.1(D)(3) and 52-1-26(D)(4)—is a matter of law we review de novo. *See Baca v. Los Lunas Cmty. Programs*, 2011-NMCA-008, ¶ 11, 149 N.M. 198, 246 P.3d 1070. Our "guiding principle when construing statutes is to determine and give effect to legislative intent." *Fowler v. Vista Care*, 2014-NMSC-019, ¶ 7, 329 P.3d 630 (internal quotation marks and citation omitted). "To discern the Legislature's intent, we rely on the classic canons of statutory interpretation and look first to the

8

plain language of the statute, giving the words their ordinary meaning, unless the Legislature indicates a different one was intended." *Id.* (internal quotation marks and citation omitted). If the plain language of a statute is clear and unambiguous, we must give it effect "unless the result would be absurd, unreasonable, or contrary to the spirit of the statute." *Taylor v. Waste Mgmt. of N.M., Inc.*, 2021-NMCA-026, ¶ 8, 489 P.3d 994 (internal quotation marks and citation omitted). In other words, even if the statute is not ambiguous, "it may nevertheless be necessary to examine" other indicia of legislative intent, such as the history, background, and purpose of the statute. *See id.*; *see also State v. Vest*, 2021-NMSC-020, ¶ 20, 488 P.3d 626 (reviewing, "as a matter of thoroughness, . . . the purpose, background, and history of the statute to ensure that [the Court's] plain-meaning interpretation does not lead to injustice, absurdity, or contradiction" (internal quotation marks and citation omitted)).

**A.     The Plain Meaning of "Misconduct"**

{12}     We first turn our attention to the plain meaning of "misconduct" within Sections 52-1-25.1(D)(3) and 52-1-26(D)(4). *See, e.g.*, *Vest*, 2021-NMSC-020, ¶ 14; *Fowler*, 2014-NMSC-019, ¶ 7. As noted, these sections provide that a worker is not entitled to TTD and PPD modifier benefits if "the worker is terminated for *misconduct* connected with the employment that is unrelated to the workplace injury

[or accident]." *See* §§ 52-1-25.1(D)(3), -26(D)(4) (emphasis added). No definition of "misconduct" is provided in the Act.

{13}     Where, as here, a word is "not otherwise defined in a statute, we give [the word its] ordinary meaning absent clear and express legislative intention to the contrary." *Vest*, 2021-NMSC-020, ¶ 14 (internal quotation marks and citation omitted); *see Bajart v. Univ. of N.M.*, 1999-NMCA-064, ¶ 11, 127 N.M. 311, 980 P.2d 94 (presuming that "the [L]egislature intends the plain and common meaning of the words used in the [Act]"). "To do so, we consult common dictionary definitions." *Vest*, 2021-NMSC-020, ¶ 14; *see Bajart*, 1999-NMCA-064, ¶ 11 (utilizing *Black's Law Dictionary* definitions to discern the plain and common meaning of words in the Act); *see also State v. Farish*, 2021-NMSC-030, ¶ 12, 499 P.3d 622 ("The plain meaning of statutory language is informed by dictionary definitions."). As Employer observes, there is near consensus about the meaning of "misconduct," with the common dictionary definition being "improper behavior." The edition of *Black's Law Dictionary* in effect at the time Sections 52-1-25.1 and 52-1-26 were amended in 2017 defines "misconduct" as "[a] dereliction of duty; unlawful, dishonest, or improper behavior . . . ." [5] *Misconduct, Black's Law*

_____

[5]While some dictionaries include "intentional wrongdoing" or "malfeasance" as an alternative definition of misconduct, *see, e.g.*, *Misconduct, Webster's Third New Int'l Dictionary* 1443 (Unabridged ed. 1993), *Black's Law Dictionary* distinguishes between "misconduct" and "willful misconduct," which means "[m]isconduct committed voluntarily and intentionally," *Misconduct, Black's Law*

10

*Dictionary* (10th ed. 2014); *accord Misconduct*, 9 *Oxford English Dictionary* 855 (2d. ed. 1991) (defining "misconduct" as "[i]mproper conduct; wrong behavior").

**{14}** Worker does not contest that the plain, ordinary meaning of "misconduct" is "improper behavior;" nor does she assert the existence of statutory ambiguity.[6] Thus, we must give effect to this plain meaning unless there is some compelling reason to depart therefrom. *See Taylor*, 2021-NMCA-026, ¶ 8 (providing that if the plain language of a statute is clear and unambiguous, it generally must be given effect); *see also Massengill v. Fisher Sand & Gravel Co.*, 2013-NMCA-103, ¶¶ 7-12, 311 P.3d 1231 (examining the employer's contentions against applying the plain meaning of the statute).

**B.     Reasons for Departing From the Plain Meaning**

**{15}** Worker argues against the plain meaning and in support of a definition more favorable to workers—i.e., one requiring "willful misconduct." Specifically, Worker

---

*Dictionary* (10th ed. 2014). *Black's Law Dictionary* further distinguishes between "employee misconduct" and "willful employee misconduct." The former covers "a broad range of behaviors, from minor infractions of company rules to criminal conduct," while the latter requires "[t]he deliberate disregard by an employee of the employer's interests, including its work rules and standards of conduct, justifying a denial of unemployment compensation if the employee is terminated for the misconduct." *Id.* As discussed below, *see infra* ¶¶ 29-31, the distinction between "misconduct" and "willful misconduct" is recognized within the workers' compensation context.

[6]Even were the meaning of "misconduct" ambiguous, we would conclude, for the reasons set out below, that "misconduct," as used in Sections 52-1-25.1(D)(3) and 52-1-26(D)(4), means "improper behavior."

11

argues that this Court should—at a minimum—interpret "misconduct" within Sections 52-1-25.1(D)(3) and 52-1-26(D)(4) in the same way that term is understood in the Unemployment Compensation Law, NMSA 1978, §§ 51-1-1 to -59 (1936, as amended through 2023). In support of this approach, Worker advances policy-based arguments and relies on pre-enactment legislative history. Taking Worker's contentions up in turn, none of them persuade us to depart from the plain meaning of "misconduct." Moreover, looking to other indicators of legislative intent, we find no other reason to depart from the plain meaning.

**1. "Misconduct" Within the Unemployment Compensation Law**

{16} Worker urges us to employ the body of law from the unemployment compensation context when construing the meaning of "misconduct" in Sections 52-1-25.1(D)(3) and 52-1-26(D)(4). We first examine the meaning of "misconduct" within the Unemployment Compensation Law, and then explain why Worker's request to employ this meaning in the workers' compensation context is not well taken.

{17} Similar to the Act, the Unemployment Compensation Law provides that an employee is not entitled to unemployment compensation benefits if they have "been discharged for misconduct connected with the individual's employment." Section 51-1-7(A)(2). Within the Unemployment Compensation Law, the term "misconduct" is construed in favor of employees because of that law's remedial

purpose. *See Rodman v. N.M. Emp. Sec. Dep't*, 1988-NMSC-089, ¶ 13, 107 N.M. 758, 764 P.2d 1316 ("Given the remedial purpose of the statute, and the rule of statutory construction that its provisions are to be interpreted liberally, the statutory term 'misconduct' should not be given too broad a definition."). In light of this construction, our Supreme Court has held that the term "misconduct" in the unemployment compensation context "is limited to conduct in which employees bring about their own unemployment by such callousness, and deliberate or wanton misbehavior that they have given up any reasonable expectation of receiving unemployment benefits." *Fitzhugh v. N.M. Dep't of Labor*, 1996-NMSC-044, ¶ 42, 122 N.M. 173, 922 P.2d 555. Although "misconduct" for purposes of the Unemployment Compensation Law does not exclude careless or negligent behavior, such conduct must be "of such degree or recurrence so as to suggest equal culpability, wrongful intent, or evil design, or so as to reveal an intentional and substantial disregard of the employer's interests, or of the employee's duties and obligations to [their] employer." *Id.* Accordingly, the employer must "prov[e] that the employee was discharged for *willful* misconduct" before unemployment compensation benefits will be denied. *Id.* ¶ 44 (emphasis added).

{18}     In contrast to the remedial nature of the Unemployment Compensation Law that drove our Supreme Court's construction of the term "misconduct" in favor of employees, the Legislature has declared, through the enactment of NMSA 1978,

Section 52-5-1 (1990), that the Act is "not remedial in any sense and [is] not to be given a broad liberal construction in favor of the claimant or employee . . . ." Section 52-5-1. That is, "the common law rule of 'liberal construction' based on the supposed 'remedial' basis of workers' benefits legislation *shall not* apply." *Id.* (emphasis added). Courts in New Mexico repeatedly have held that Section 52-5-1 is a command from the Legislature to no longer construe the Act liberally in favor of either party. For instance, our Supreme Court in *Delgado v. Phelps Dodge Chino, Inc.*, 2001-NMSC-034, 131 N.M. 272, 34 P.3d 1148, recognized that Section 52-5-1 "*precludes* [courts] from interpreting the Act in any way that would favor either the worker or the employer." 2001-NMSC-034, ¶ 17 (emphasis added); *see also, e.g.*, *Rodriguez v. Brand W. Dairy*, 2016-NMSC-029, ¶ 12, 378 P.3d 13 ("This provision *requires* [courts] to balance equally the interests of the worker and the employer without showing bias or favoritism toward either." (emphasis added) (internal quotation marks and citation omitted)).[7]

---

[7]As we recognized in *Taylor*, 2021-NMCA-026, ¶ 8 n.3, a stray comment in *Benavides v. Eastern New Mexico Medical Center*, 2014-NMSC-037, 338 P.32 1265, suggests that courts may still liberally construe the Act in favor of the worker. *See Benavides*, 2014-NMSC-037, ¶ 44 ("[L]iberal construction can still be applied by this Court as it is but one of many tools employed in construing legislation."). In making this statement, however, we understand that *Benavides* merely was "agree[ing]" with this Court in *Garcia v. Mt. Taylor Millwork, Inc.*, 1989-NMCA-100, 111 N.M. 17, 801 P.2d 87. *See Benavides*, 2014-NMSC-037, ¶ 44. *Garcia* held that, although Section 52-5-1 did not overrule existing case law, "the abandonment of liberal construction is intended as a guide for the future." 1989-NMCA-100, ¶ 10. We read *Benavides* only to mean what this Court said in *Garcia*—i.e., that Section

14

{19} Worker never acknowledges Section 52-5-1's dispositive statement of legislative intent, notwithstanding Employer's reliance on the same to argue that "misconduct" in the Act should be interpreted differently than under the Unemployment Compensation Law.[8] Given the clear directive from the Legislature, we cannot construe "misconduct" in the Act in favor of workers as we do under the Unemployment Compensation Law. As a result, we decline Worker's invitation to construe "misconduct" in the Act to mean "willful misconduct," as is done in the unemployment compensation context. *See Boyd v. Permian Serv. Co.*, 1992-NMSC-013, ¶ 12, 113 N.M. 321, 825 P.2d 611 ("We cannot . . . recognize a policy inconsistent with a declaration of the [L]egislature."). We thus turn to Worker's additional arguments against the plain meaning, and in support of a definition of "misconduct" more favorable to her.

---

52-5-1 did not retroactively overrule case law relying on the rule of liberal construction, but that liberal construction could no longer be used to interpret the Act following the enactment of Section 52-5-1. *See Garcia*, 1989-NMCA-100, ¶¶ 9-10.

[8]Worker instead cites a single case from Florida, *Thorkelson v. NY Pizza & Pasta, Inc.*, 956 So. 2d 542 (Fl. Dist. Ct. App. 2007), to support her contention that we should borrow the meaning of "misconduct" from the unemployment compensation context. Worker asserts that Florida defines "misconduct" the same in both unemployment and workers' compensation contexts. But, as Employer points out, this is only true because the Florida legislature, unlike our Legislature, *statutorily* defines "misconduct" "virtually identically" in both contexts. *Id.* at 544. We accordingly do not find *Thorkelson* persuasive.

15

## 2. Policy Considerations

{20} Worker advances two policy-based arguments. First, Worker maintains throughout her briefing that "the purpose of the . . . Act is to prevent an injured worker from becoming a public charge." Specifically, Worker argues, if "misconduct" under Sections 52-1-25.1(D)(3) and 52-1-26(D)(4) is interpreted less favorably than in the unemployment compensation context, a worker terminated for misconduct could be denied workers' compensation benefits but still receive unemployment compensation benefits. Such an outcome, Worker posits, "would be in direct opposition with the spirit of the Act and its purpose to keep injured workers from becoming a financial burden [on] our society."

{21} We are not persuaded by this argument because the Act itself contemplates the exact outcome Worker claims would violate its purpose. For instance, the Act provides that generally, "[n]o total disability benefits shall be payable under the . . . Act for any weeks in which the injured worker has received or is receiving unemployment compensation benefits." Section 52-1-70(A). The only exception to this is *if* a worker is otherwise entitled to both types of benefits, the worker may receive benefits up to an amount equal to their "total disability benefits that would otherwise be payable." Section 52-1-70(B). Even then, the Legislature has declared that "the unemployment compensation benefits shall be primary and total disability benefits shall be supplemental only." *Id.* Thus, contrary to Worker's contentions, the

16

Act contemplates a worker being entitled to unemployment compensation benefits but not certain workers' compensation benefits.

{22}     Second, Worker argues that construing "misconduct" in Sections 52-1-25.1(D)(3) and 52-1-26(D)(4) according to its plain, ordinary meaning would permit employers to terminate workers for minor infractions of workplace policy in order to deny TTD and PPD modifier benefits. As examples, Worker provides that, under the plain meaning of "misconduct," a worker could be terminated and thereby denied TTD and PPD modifier benefits for "miscount[ing] change and giv[ing] a customer one dime too many" or "arriv[ing] to work one minute late, having never been late to work before." But as Employer points out in its answer brief, and as Worker ignores in her reply brief, the Act safeguards against such an outcome.

{23}     In particular, the Act provides for penalties against employers who act in bad faith or engage in pretextual firing or retaliation:

> [I]f the workers' compensation judge finds that an employer terminated the worker for pretextual reasons as a way of attempting to avoid payment of benefits to the worker or as retaliation against the worker for seeking benefits, the worker shall be entitled to temporary total disability benefits and the employer shall be subject to penalties as set forth in Sections 52-1-28.1 and 52-1-28.2.

Section 52-1-25.1(D)(3); *accord* § 52-1-26(D)(4) (same for PPD modifier benefits). Section 52-1-28.1, in turn, provides that an employer who engages in bad faith shall pay the worker, "in addition to any benefits due and owing, a benefit penalty not to exceed twenty-five percent of the benefit amount ordered to be paid." Section 52-1-

28.1(B). Similarly, Section 52-1-28.2 provides that an employer who terminates a worker in retaliation for that worker seeking benefits must rehire the worker and pay a civil penalty of up to $5,000 to the workers' compensation administration fund. *See* § 52-1-28.2(B)-(D). Furthermore, with the 2017 amendments to 52-1-25.1 and 52-1-26, the Legislature added additional penalties against an employer who uses "misconduct" as a pretext to terminate a worker. Specifically, "[u]pon a finding that an employer has terminated a worker for pretextual reasons, the workers' compensation judge at the judge's discretion may also impose an *additional* fine, not to exceed ten thousand dollars ($10,000), on the employer, to be paid to the worker." Section 52-1-25.1(E) (emphasis added); *accord* § 52-1-26(E). These legislatively-enacted safeguards are significant enough to deter employers from attempting to terminate workers for minor workplace infractions in order to deny an injured worker TTD or PPD. We accordingly find this basis for departing from the plain meaning unpersuasive.

{24}    Similarly, it is unnecessary to incorporate the Act's prohibition against pretextual terminations within the definition of "misconduct" by defining that term, as Employer suggests, to mean "improper behavior for which any employee would be terminated." In support, Employer cites *McRae v. Toastmaster, Inc.*, 597 S.E.2d 695, 700 (N.C. 2004), a North Carolina case that construed a statute providing that an injured worker was not entitled to benefits if they refused suitable employment.

18

*McRae* observed that an earlier decision, *Seagraves v. Austin Co. of Greensboro*, 472 S.E.2d 397 (N.C. Ct. App. 1996), had considered whether, absent a clear statutory directive, "an employee can be deemed to have refused suitable employment . . . if [they are] terminated for misconduct that is unrelated to [their] workplace injuries." *McRae*, 597 S.E.2d at 698. Unlike this Court in *Hawkins*, 2014-NMCA-048, ¶ 11, *Seagraves* answered that question in the affirmative, so long as, inter alia, "the employee was terminated for misconduct[] that . . . would have resulted in the termination of a nondisabled employee." *McRae*, 597 S.E.2d at 701. *McRae* adopted the *Seagraves*' test because the North Carolina court believed the test fairly balanced the interests of the employer and worker to "determine if the circumstances surrounding a termination warrant preclusion or discontinuation of injury-related benefits." *McRae*, 597 S.E.2d at 700. We, however, need not incorporate Employer's proposed test into the definition of "misconduct" here because, unlike North Carolina, our Legislature has engaged in this balancing statutorily through its adoption of the safeguards against employers acting in bad faith and engaging in pretextual and retaliatory firings, as just discussed. *See also infra* ¶¶ 32-34. We thus decline, as unnecessary and redundant, Employer's invitation to judicially incorporate the concept of pretext into the definition of "misconduct." *See Cordova v. Taos Ski Valley, Inc.*, 1996-NMCA-009, ¶ 22, 121

19

N.M. 258, 910 P.2d 334 ("In analyzing a statute, we must attempt to achieve internal consistency and avoid making any portion of the statute superfluous.").

**3.      Legislative History**

{25}      Worker next contends that certain indicators of legislative history counsel against our giving "misconduct," in Section 52-1-25.1(D)(3) and 52-1-26(D)(4), its plain meaning. Worker asserts that the "progression of language" through the various amendments to Senate Bill 155, S.B. 155, 53rd Leg., 1st Sess. (N.M. 2017)—the bill that amended Sections 52-1-25.1 and 52-1-26 in 2017—indicates that the Legislature intended to "heighten the standard by which [w]orkers are denied TTD and/or [PPD] modifiers." Worker also invites us to consider another WCJ's analysis of the issue in a different compensation order because, according to Worker, this WCJ was "the actual expert who participated in the legislative hearings regarding the 2017 amendments." For the reasons that follow, we decline to consider these purported sources of legislative intent.

{26}      Worker's request that we consider the changes in the text of Senate Bill 155 as it progressed through various committees is discouraged by *Vest*. *See* 2021-NMSC-020, ¶¶ 33-34. In *Vest*, our Supreme Court noted that "[t]here are countless reasons why language may be added or deleted during the legislative drafting process and, unlike the United States Congress, our Legislature does not keep a record of floor debates or committee hearings." 2021-NMSC-020, ¶ 33.

20

Accordingly, we are cautioned to "refrain from inferring legislative purpose from such edits." *Id.* Although we may "consider the history and background of [a] statute," we are not to consider "the 'legislative history' of a bill's enactment before it became law" to discern the meaning of words within a statute. *See id.* ¶ 34 (internal quotation marks and citations omitted); *see also Regents of Univ. of N.M. v. N.M. Fed. of Tchrs.*, 1998-NMSC-020, ¶ 32, 125 N.M. 401, 962 P.2d 1236 ("The exclusion of [language] from the final statute tells us nothing dispositive about the Legislature's intentions; such exclusions are not even necessarily indicative of what the Legislature did *not* intend.").

{27}     We likewise do not consider what another WCJ said about the Legislature's intent in passing Senate Bill 155, even if that WCJ participated in that bill's legislative hearings. It has long been understood that "[t]he statements of legislators, especially after the passage of legislation, cannot be considered competent evidence in establishing what the Legislature intended in enacting a measure." *Regents of Univ. of N.M.*, 1998-NMSC-020, ¶ 32. If we cannot consider what an individual legislator later says about legislative intent, then a fortiori we cannot consider such statements from a person who merely participated in the legislative process. *See id.* ("If the testimony of actual legislators is not recognized as competent, then statements from citizens who drafted early versions of legislation are even less competent.").

21

**{28}** Having rejected Workers' various arguments, we turn briefly to two other indicators of legislative intent and determine that neither provide any reason to depart from the plain meaning of "misconduct," within Sections 52-1-25.1(D)(3) and 52-1-26(D)(4).

**4. Statutory Scheme**

**{29}** There exists within the workers' compensation statutory scheme a distinction between "misconduct" and "willful misconduct." Given this, Employer argues, had the Legislature intended to require deliberate or wanton misbehavior as a precondition to forfeiting TTD and PPD modifier benefits, the Legislature could have utilized the term "willful misconduct" in Sections 52-1-25.1(D)(3) and 52-1-26(D)(4) to effectuate that purpose. We agree.

**{30}** The Legislature invoked the term "willful misconduct" in NMSA 1978, Section 52-3-45 (1945) to bar a worker from receiving "compensation for disablement or death from an occupational disease when such disablement or death, wholly or in part, was caused by[, among other things,] the *willful misconduct*" of the worker. (Emphasis added.) Under Section 52-3-45, if the disablement or death from an occupational disease is a result of the worker's willful misconduct, workers' compensation benefits are barred entirely. *See Pearson v. Johnson Controls, N. N.M., LLC*, 2011-NMCA-034, ¶¶ 14-15, 149 N.M. 740, 255 P.3d 318. In contrast, under Sections 52-1-25.1(D)(3) and 52-1-26(D)(4), a worker's "misconduct,"

unrelated to the workplace injury, that results in termination does not bar workers' compensation benefits entirely. Instead, a worker continues to be eligible for certain workers' compensation benefits, including medical benefits and PPD benefits without modifiers, *see* §§ 52-1-25.1(F), -26(D), -42(A)(1), (2), with only TTD and PPD modifier benefits being forfeited, *see* §§ 52-1-25.1(D)(3), -26(D)(4).

{31} The Legislature thus saw fit to distinguish "misconduct" from "willful misconduct," within the workers' compensation context, with associated degrees of consequences. Had the Legislature intended "misconduct" in Sections 52-1-25.1(D)(3) and 52-1-26(D)(4) to mean deliberate or wanton misbehavior or something similar, the Legislature certainly could have used the term "willful misconduct" to reflect such an intention, as it did in Section 52-3-45. We will not read this language into the Act. *See Taylor*, 2021-NMCA-026, ¶ 15 (providing that we will not read words into a statute, "given that the Legislature easily could have included such language if it so intended"); *Hawkins*, 2014-NMCA-048, ¶ 14 ("It is not our place to insert language into the [Act] that does not exist. That task falls to the Legislature alone."); *cf. State v. Jade G.*, 2007-NMSC-010, ¶ 28, 141 N.M. 284, 154 P.3d 659 ("[W]hen the Legislature includes a particular word in one portion of a statute and omits it from another portion of that statute, such omission is presumed to be intentional.").

## 5. The Purpose of the Act

**{32}** Finally, we examine whether the balance the Legislature has struck with Sections 52-1-25.1(D)(3) and 52-1-26(D)(4) is contrary to the purpose of the Act. Broadly speaking, the overarching purpose of the Act is "to assure the quick and efficient delivery of indemnity and medical benefits to injured and disabled workers at a reasonable cost to the employers." Section 52-5-1. "To fulfill this purpose, the Act enforces a bargain in which an injured worker gives up [their] right to sue the employer for damages in return for an expedient settlement covering medical expenses and wage benefits, while the employer gives up its defenses in return for immunity from a tort claim." *Taylor*, 2021-NMCA-026, ¶ 24 (internal quotation marks and citation omitted); *see also Schultz ex rel. Schultz v. Pojoaque Tribal Police Dep't*, 2014-NMCA-019, ¶ 6, 317 P.3d 866 (recognizing that the Act "represents a delicate balance between the rights and interests of the worker and the employer" (internal quotation marks and citation omitted)).

**{33}** The Legislature, in response to this Court's decision in *Hawkins*, balanced the interests of employers and workers through its amendment of Sections 52-1-25.1 and 52-1-26. These statutory provisions protect injured workers from employers who might act in bad faith to terminate a worker in order to avoid paying workers' compensation benefits, while protecting employers against injured workers who engage in misconduct, unrelated to the workplace injury, that results in their

24

termination. These statutory provisions further balance the interests of workers and employers by reducing—but not entirely eliminating—workers' compensation benefits owed to workers terminated for their own misconduct unrelated to the workplace injury. *See* §§ 52-1-25.1(D), (F), -26(D), -42(A)(1), (2).

{34} In light of the foregoing, it appears to us that the Legislature has struck a delicate balance between the rights and interests of workers, on the one hand, and of employers, on the other. *See Schultz*, 2014-NMCA-019, ¶ 6. Construing "misconduct" contrary to its plain meaning—and more favorably to workers, as Worker requests—would upset the Legislature's balancing of interests, which we will not do. *See Taylor*, 2021-NMCA-026, ¶ 25 ("We cannot say that the Legislature's decision . . . to balance the interests of employers and workers in this manner is absurd or unreasonable, and it is not up to the courts to second-guess such a choice."). We conclude the plain meaning of "misconduct" is consistent with the purpose of the Act. *See id.* ¶ 26.

**C.      The Plain Meaning of "Misconduct" Within Sections 52-1-25.1(D)(3) and 52-1-26(D)(4) Should Be Given Effect**

{35} Having considered and rejected the various arguments Worker advanced against the adoption of the plain meaning, and finding no other reason not to give effect to this meaning, we hold that "misconduct," as that term is used in Sections 52-1-25.1(D)(3) and 52-1-26(D)(4), is to be given its plain, ordinary meaning—that being, "improper behavior."

25

## II. Worker's Remaining Claims of Error

{36} Worker raises two additional arguments on appeal: (1) that the WCJ's determination that Worker was terminated for misconduct is not supported by substantial evidence, and (2) that the WCJ erred by not deeming as admitted Employer's late responses to Worker's requests for admissions. These arguments, however, rely on us interpreting "misconduct" in the manner advocated by Worker. Because we do not adopt Worker's definition of "misconduct," these arguments accordingly fail.

{37} Worker concedes that "[her] termination was due to . . . performance issues alone." Nonetheless, Worker argues that substantial evidence does not support the WCJ's determination that she was terminated for misconduct because her "conduct did not meet the misconduct requirements of unemployment law." We already have rejected the definition of "misconduct" on which Worker's substantial evidence argument is predicated. Because Worker fails to argue that substantial evidence does not support a determination that her conduct satisfies the plain meaning of "misconduct," we reject her substantial evidence argument. *See Headley v. Morgan Mgmt. Corp.*, 2005-NMCA-045, ¶ 15, 137 N.M. 339, 110 P.3d 1076 ("We will not review unclear arguments, or guess at what [a party's] arguments might be."); *Corona v. Corona*, 2014-NMCA-071, ¶ 28, 329 P.3d 701 ("This Court has no duty to review an argument that is not adequately developed.").

**{38}** Finally, Worker argues that the WCJ erred by not deeming as admitted Employer's late responses to her requests for admissions. Worker contends that Employer would have been barred "from disputing the matter of Worker's termination"—and specifically would have been forced to admit that she "was not terminated for misconduct"—had all her requests been deemed admitted. We are not persuaded. The only relevant request not already admitted by Employer was a request for admission that asked Employer to "[a]dmit that Worker was not fired for *willful* misconduct." (Emphasis added.) Again, we already have concluded that "misconduct" in Sections 52-1-25.1(D)(3) and 52-1-26(D)(4) does not mean "willful misconduct." Thus, even if we assume the WCJ erred by not deeming as admitted Employer's late response, Employer's purported admission that Worker was not terminated for "willful misconduct" would have no bearing on the question of whether Worker was terminated for "misconduct" for purposes of workers' compensation benefits. We accordingly agree with Employer that Worker has not demonstrated reversible error. *See Wright v. Brem*, 1970-NMCA-030, ¶ 7, 81 N.M. 410, 467 P.2d 736 (providing that this Court's "function is to correct an erroneous result, and not to correct errors which, even if corrected, will not change the result"); *Reynolds v. Landau*, 2020-NMCA-036, ¶ 52, 468 P.3d 928 (declining to address purported error that would not change the result if corrected).

27

**CONCLUSION**

**{39}** For the foregoing reasons, we hold that "misconduct," as that term is used in Sections 52-1-25.1(D)(3) and 52-1-26(D)(4), is to be given its plain, ordinary meaning of "improper behavior." In light of this holding, we reject Worker's arguments that the WCJ erred in determining Worker was terminated for misconduct and by not deeming as admitted Employer's late responses to Worker's requests for admission. We therefore affirm.

**{40}** **IT IS SO ORDERED.**


_____
**JENNIFER L. ATTREP, Chief Judge**

**WE CONCUR:**


_____
**SHAMMARA H. HENDERSON, Judge**


_____
**KATHERINE A. WRAY, Judge**